FILED 1st JUDICIAL DISTRICT COURT
Rio Arriba County
4/24/2020 10:30 AM
KATHLEEN VIGIL CLERK OF THE COURT
Bernadette Hernandez

**FIRST JUDICIAL DISTRICT COURT**
**COUNTY OF RIO ARRIBA**
**STATE OF NEW MEXICO**

**JANE DOE,**

      **Plaintiff,**

**vs.**                        **Case No.** ___D-117-CV-2020-00167___

**THE ESPANOLA PUBLIC SCHOOLS;**    Case assigned to Biedscheid, Bryan
**RUBY E. MONTOYA, in her individual capacity;**
**GARY F. GREGOR, in his individual capacity;**

      **Defendants.**

                                     **Jury Trial Requested**

**COMPLAINT FOR CIVIL RIGHTS VIOLATIONS,**
**TITLE IX VIOLATIONS, NEGLIGENCE,**
**AND OTHER TORTIOUS CONDUCT**

COMES NOW Plaintiff, by and through her counsel, Carolyn M. "Cammie" Nichols, Alicia C. Lopez, and Maggie H. Lane of Rothstein Donatelli LLP, and brings the following causes of action pursuant to 42 U.S.C. § 1983, 20 U.S.C. § 1681, the Fourteenth Amendment of the United States Constitution, and the New Mexico Tort Claims Act, NMSA 1978, §§ 41-4-1, *et seq.*:

**PARTIES**

1.      Plaintiff Jane Doe is a resident of Bernalillo County, New Mexico.

2.      Defendant Espanola Public Schools (*hereinafter* "EPS") is a governmental entity and local public body as those terms are defined in the New Mexico Tort Claims Act, NMSA 1978, §§ 41-4-3(B) and (C), as amended. Under NMSA 1978, § 22-5-4(E), Defendant EPS has the capacity to sue or be sued. Defendant EPS is responsible for the administration

of public schools within its geographic boundaries.  At all times material hereto, Defendant EPS received federal funding and financial assistance.  At times material hereto, Defendant EPS employed Defendants Montoya and Gregor.  Plaintiff's claims pursuant to the New Mexico Tort Claims Act against Defendant EPS arise under NMSA 1978, § 41-4-6.  Under the New Mexico Tort Claims Act, Defendant EPS is vicariously liable for the acts and omissions of Defendant Montoya and Defendant Gregor.  At all times relevant, Defendant EPS was responsible for adopting and implementing the policies, customs, and practices of its employees and agents, including Defendants Montoya and Gregor.  Defendant EPS is a political subdivision of the State of New Mexico and a "person" under 42 U.S.C. § 1983.

3.      Defendant Ruby E. Montoya (*hereinafter* "Montoya") was, at times material hereto, employed by Defendant EPS as a principal at Fairview Elementary School.  She was the direct supervisor of Defendant Gregor during the time that he was employed at the Fairview Elementary School by Defendant EPS as a teacher. Upon information and belief, Defendant Montoya resides in Sandoval County, New Mexico.  At all times material hereto, Defendant Montoya was a public employee as those terms are defined in the New Mexico Tort Claims Act, NMSA 1978, § 41-4-3 (F), as amended.  Defendant Montoya acted in the course and scope of her duties as an EPS employee and under color of law.  She is sued in her individual capacity for purposes of Plaintiff's claims brought under 42 U.S.C. § 1983.

4.      Defendant Gary F. Gregor (*hereinafter* "Gregor") was, at times material hereto, employed by Defendant EPS as a teacher at Fairview Elementary School. Upon information and belief, Defendant Gregor is currently incarcerated in Otero County, New Mexico.  At all times material hereto, Defendant Gregor was a public employee as that term is defined in the New Mexico Tort Claims Act, NMSA 1978, § 41-4-3 (F), as amended.  Defendant Gregor

acted in the course and scope of his duties as an EPS employee and under color of law.  He is sued in his individual capacity for purposes of Plaintiff's claims brought under 42 U.S.C. § 1983.

5.     With respect to Plaintiff's New Mexico Tort Claims Act claims, the acts and omissions complained of herein all constitute a basis for liability against Defendant EPS, within the scope of the waivers of immunity proscribed by the New Mexico Tort Claims Act, NMSA 1978 §§ 41-4-1, *et seq*.

## JURISDICTION AND VENUE

6.     The First Judicial District Court has original jurisdiction over this matter under N.M. Const., Art. VI, § 13.

7.     Venue is properly located in the First Judicial District under NMSA 1978, § 38-3-1(A).

## FACTUAL ALLEGATIONS

### I.     THE CAREER AND PREDATION HISTORY OF DEFENDANT GREGOR

8.     Defendant Gregor began teaching elementary school children in Utah in the Fall of 1984.  He taught there continuously until the Spring of 1995, according to Utah's "Verification of Teaching Service."

9.     While in Utah, he taught classes of fourth graders, fifth graders, combined fourth and fifth graders, and combined fifth and sixth graders.  He taught at two different elementary schools over 11 years.

10.    In October of 1994, a concerned parent called law enforcement when her elementary school-aged daughter did not come home when expected and was missing for several hours.

11.    It was discovered that Defendant Gregor had kept the girl, and another elementary school-aged girl, in his classroom after the school day was over.

12.    Investigation disclosed that, while in Defendant Gregor's classroom with him, the girls popped popcorn, watched movies, listened to music, did gymnastics, played around, and that Defendant Gregor asked them about their brassiere sizes and their menstrual periods.

13.    The girls were alone in the classroom with Defendant Gregor for approximately four and one-half hours.

14.    The parents of both girls were reportedly upset "because there were rumors that Mr. Gregor had been accused of sexual abuse of a child in the past;" and "[b]oth sets of parents were afraid that Mr. Gregor was befriending their children in order to possibly victimize them in the future."

15.    Neither girl disclosed sexual touching, but it is unclear whether the girls were provided with an opportunity to discuss the case with a forensic interviewer or were just questioned by officers and parents.

16.    Defendant Gregor claimed "he just started talking to the girls and lost track of time." He was told by the school that he could no longer have students in his classroom after hours.

17.    He was not charged criminally, but police reports were generated, and those police reports are available as public records upon request.

18.     The school claimed that "the allegations about having a similar complaint against him were untrue."

19.     However, in January of 1994, 10 months prior to the October 1994 incident, public records reveal that Defendant Gregor had, in fact, been accused of sexual misconduct with three of his female elementary school-aged students.

20.     One of the girls recounted that Defendant Gregor rubbed her buttocks, hugged her, kissed her, caressed her thigh, said he loved her, and told her he wanted to take her to Montana when she turned 16 to marry her.

21.     Another girl recounted that Defendant Gregor rubbed her thigh on numerous occasions, kissed her thigh, and hugged her.

22.     One of the girls recounted that she could feel Defendant Gregor's penis harden when he sat her in his lap, and when he hugged her tight against him.

23.     In January of 1995, criminal charges were filed against Defendant Gregor for this sexual misconduct, namely two felony counts of aggravated sex abuse of a child and one misdemeanor count of lewdness involving a child.

24.     The day before the criminal trial was set to begin, a Utah District Court Judge dismissed the case, reportedly "not[ing] that even assuming the truthfulness of the allegations against [Defendant] Gregor, the conduct did not rise to the level of a criminal act."

25.     On May 17, 1996, Defendant Gregor was issued a letter of reprimand by the Utah Professional Practices Advisory Commission.  The letter states that the Commission "found no evidence of immoral conduct, but did conclude that [Defendant Gregor] ha[d] been guilty of exhibiting a lack of professional judgment in some of [his] teaching activities, which [he himself] recognized and verbalized before the hearing panel."

26.     From August of 1996 through May of 1997, Defendant Gregor worked as a special education teacher and an after-school tutor on a reservation in Montana, where, he claims, he "acted as principal/superintendent on numerous occasions in the absence of the school district's principal/superintendent."

27.     Public records indicate that Defendant Gregor disclosed to Defendant PED in March of 1998 that he was "terminated by the Davis County School District for what they considered insubordination, school policy was that after school activities with students was [sic] not allowed."

## II.     DEFENDANT GREGOR'S EMPLOYMENT BY SANTA FE PUBLIC SCHOOLS AND SEXUAL ABUSE OF MULTIPLE STUDENTS AT AGUA FRIA ELEMENTARY SCHOOL

28.     On July 1, 2001, Defendant Gregor obtained two teaching licenses in the state of New Mexico, one for Level 2, Elementary K-8, and another for Special Education, K-12.

29.     Public records indicate that Defendant Gregor applied for a job with the Santa Fe Public School (*hereinafter*, "SFPS") in June of 1998.

30.     Public records indicate that Defendant Gregor was officially hired by SFPS in August of 2000.  Other public records indicate that Defendant Gregor may have been hired by SFPS as early as March of 1998.

31.     A simple background check by SFPS, including basic research of public records, presumably would have revealed the criminal charges and the true facts surrounding Defendant Gregor's leaving employment as a teacher in Utah.

32.     SFPS hired Defendant Gregor to teach the school children of the district with no apparent inquiry into Defendant Gregor's criminal background and employment history in Utah.

33.     Defendant Gregor signed a Certified (Licensed) School Instructor Contract with SFPS in December of 2000 for the 2000-2001 school year.

34.     In the 2000-2001 school year, his first year as a classroom teacher for SFPS, Defendant Gregor taught sixth grade Special Education at Ortiz Middle School.

35.     Defendant Gregor received negative evaluations at Ortiz Middle School, and was not recommended for re-hire.

36.     Yet, Defendant Gregor was hired by Principal Vickie Sewing at Agua Fria Elementary in Santa Fe, and he began teaching the sixth grade there in August of 2001.

37.     Defendant Gregor received positive evaluations during his first year at Agua Fria Elementary, and moved on to teaching fourth grade the following year, signing a contract to teach for the Santa Fe Public Schools again, for the 2002-2003 school year, in September of 2002.

38.     In June of 2003, Sewing gave Defendant Gregor a completely positive evaluation, rating him as meeting or exceeding expectations in every instance.

39.     Indeed, Sewing commented that Defendant Gregor "is caring towards his students and looks for ways to challenge them and to help them achieve."

40.     Defendant Gregor thus returned to the classroom for the 2003-2004 school year, where he sexually abused several of his fourth-grade students.

41.     Classmates observed how Defendant Gregor would pick up certain young female students by the waist and place them on his lap, touching and stroking their hair and tickling them.

42.     Defendant Gregor would sometimes get an erection while sitting with one of his female students in his lap, although the young girls did not initially understand what was happening.

43.     Defendant Gregor would sometimes keep female students, alone, in his classroom with him during lunch or recess.

44.     Alone in the classroom with these girls, he would sexually assault them, including by fondling them, forcing them to fondle him, forcing them to kiss his genitals, and penetrating them.

45.     He would fondle them during class time, as he held them in his lap.

46.     On January 28, 2004, Aurelia Gonzales, Director of Education at the Museum of International Folk Art, notified Principal Sewing, by telephone and email, that docents at the museum observed inappropriate behavior by Defendant Gregor with his students during a field trip to the museum on January 27, 2004.

47.     Museum docents observed and reported that Defendant Gregor was "fondling girls," sitting with girls on his lap, and falling asleep with two of the girls (later identified as C.F. and R.P.) sitting so close to him that he woke because they had to shift positions.

48.     Agua Fria Principal Sewing spoke directly with the docents, verifying their observations.

49.     Docent Judy Laughlin explained to the principal how she observed "two blonde girls [ ] hanging on and hugging" Defendant Gregor.

8

50.    Defendant Gregor and the girls "were constantly touching each other and it was troubling to see," while "the boys were left 'on their own trip.'"

51.    Ms. Laughlin felt that Defendant Gregor's interactions with the little blonde girls was "over the top" and "just too much."

52.    Docent Lois Callaghan informed Agua Fria Principal Sewing that "there was a lot of touching" between Defendant Gregor and the two girls, which continued until Defendant Gregor fell asleep.

53.    Ms. Callaghan stated that "at no time have I seen a teacher behave in such an unprofessional manner," in her thirty-year teaching career or five years as a museum docent.

54.    Principal Sewing informed Diane Sparago, Chief Human Resources Officer for SFPS, and Defendant Gregor was placed on administrative leave by SFPS on February 3, 2004.

55.    Following the docents' revelations, Principal Sewing and a staff member with Human Resources interviewed eight of Defendant Gregor's students, including a number of sexually abused girls.   The information relayed by the students during those interviews revealed that Defendant Gregor: hugs the girls in his class 'all the time;' sat girls on his lap during class time; tickled the girls; 'squished' the girls when he played basketball with them; gave 'raspberries' to the kids when they were 'bad;' only got angry with the boys in his class; and gave gifts to at least one girl in his class, including a Valentine's Day gift of a stuffed unicorn with a heart reading 'kisses and hugs.'

56.    Despite the fact that she herself found the described behavior to be cause for "serious concerns," and "believe[d] this may well be 'grooming' behavior on the part of Dr. Gregor," the principal prepared a statement asserting that the fondling witnessed by the

museum docents and behavior described by Defendant Gregor's students "does not seem to constitute child abuse or criminal sexual conduct or a more serious sexual act."

57.     Consequently, no arrangements were made for forensic interviews of the students.

58.     Indeed, Principal Sewing did not report any of her "serious concerns" to the New Mexico Children, Youth, and Families Department (*hereinafter* "CYFD") or to law enforcement, nor did anyone else involved in or aware of her investigation make any report to CYFD or to law enforcement.

59.     Based on the foregoing investigation, SFPS decided to serve Defendant Gregor with a notice of discharge.

60.     In March of 2004, a request was made to the Santa Fe Rape Crisis Center, not to conduct forensic interviews but to teach an instructional unit called "'Project Aware' to help students understand good touch/bad touch, and about boundaries and their bodies."

61.     On May 6, 2004, Helen Nakdimen of the Santa Fe Rape Crisis Center wrote a letter to Defendant Sewing describing what Defendant Gregor's students disclosed to her on April 13, 2004, and April 27, 2004, during the "Project Aware" presentations.  Specifically, she described the students revealing to her that:

      a.     Defendant Gregor would hold girls in his lap and tickle them, during which they felt his "boner," "his thing was sticking up," and it was "nasty!"

      b.     Defendant Gregor would make boys wait an hour before allowing them to go to the bathroom.

c.      Defendant Gregor would threaten boys with permanent loss of recess and force them to give him their snacks.

d.      Defendant Gregor preferred two little blonde girls, C.F. and R.P., in particular, and asked one of them to meet him alone in the classroom; when she brought a friend with her because she felt uncomfortable, he became angry with her.

e.      Defendant Gregor would slam doors, throw papers off his desk, and verbally threaten his students.

f.      Defendant Gregor said he was an acupuncturist, brought needles to class, used them on himself, dared his students to do it to themselves, and told them to call him "Dr. Gregor."

62.     This marked the first time that it was specifically reported that Defendant Gregor was sexually aroused during his inappropriate contact with R.P. and C.F..

63.     Still, none of this was reported to CYFD or to law enforcement by Principal Sewing or SFPS, and none of the students were referred for a forensic interview.

### III.   SFPS' REPORT TO THE PUBLIC EDUCATION DEPARTMENT AND DECISION TO PROVIDE DEFENDANT GREGOR WITH A NEUTRAL RECOMMENDATION

64.     On February 26, 2004, SFPS reported, in writing, to the New Mexico Public Education Department (*hereinafter* "PED"), that an investigation corroborated inappropriate physical contact between Defendant Gregor and his female students.

65.     Defendant Gregor responded to the allegations, and included his response in a letter to the PED on April 8, 2004, prior to his decision to agree to resign.

66.     Upon learning of the information obtained by the Santa Fe Rape Crisis personnel, Defendant Gregor decided to forego a "due process discharge hearing," and instead "agreed to resign from his position with" SFPS.

67.     SFPS negotiated an agreement with Defendant Gregor.

68.     This agreement was executed by SFPS (through Superintendent Dr. Gloria Rendon) and Defendant Gregor on June 15, 2004.

69.     The agreement was entitled "Resignation and Full and Final Agreement and Release of All Claims," and it provided:

   a.     Defendant Gregor would resign his employment with SFPS.

   b.     Defendant Gregor would agree to withdraw his request for a hearing before the School Board of SFPS.

   c.     Defendant Gregor would "not apply for nor accept employment by SFPS."

   d.     Defendant Gregor released SFPS from any potential civil claims he might bring against it.

   e.      "SFPS District will give a neutral reference to all persons who make inquiry as to Mr. Gregor's employment with the District which shall consist of the dates of employment, job titles, and rates of pay."

70.     SFPS, therefore, agreed with Defendant Gregor that if any other school district contacted SFPS about hiring Defendant Gregor as a teacher, SFPS would not provide that school district with any information about Defendant Gregor's sexual abuse of his students.

71.     The decision to give Defendant Gregor a neutral recommendation, even after hearing numerous reports of his sexual misconduct with R.P. and C.F., was ultimately made by SFPS Superintendent Rendon.

72.     According to Superintendent Rendon, providing Defendant Gregor with a neutral recommendation that would allow him to more easily be hired elsewhere was justified because "my first obligation was to the students in Santa Fe."

73.     However, Superintendent Rendon did not see SFPS' obligations as including a duty to report Defendant Gregor's sexual misconduct, as described by the docents and the students themselves.

74.     Rather, Superintendent Rendon has asserted, "it was the duty of the docents" at the Museum of International Folk Art to report what they saw to law enforcement.

75.     Because Principal Sewing and other SFPS officials "never saw any of this behavior[,] [t]hey were going on what they had been told others had seen," Superintendent Rendon did not believe that they were required to inform law enforcement of what they learned or refer R.P. and C.F. for forensic interviews.

76.     Following SFPS' report to the PED, a review by the Educators Ethics Bureau verified inappropriate sexual contact of minor students as well as sexual harassment of minor students, along with other ethical violations, by Defendant Gregor.

77.     Based on this review, the PED executed a formal written reprimand of Defendant Gregor on May 13, 2005, to be placed permanently in Defendant Gregor's licensure file with the PED.

78.   This formal reprimand documented the Educators Ethics Bureau's findings of sexual contact and sexual harassment by Defendant Gregor towards his students, along with other ethical violations.

79.   Information was posted on the NASDTEC Clearinghouse, providing information to potential employers that a "Public Reproval or Formal Reprimand" had been issued against Defendant Gregor; that Defendant Gregor would "retain [his] license/certificate in [New Mexico]; that the "action [was] based upon sexual misconduct that did not result in a criminal conviction;" and that "the action [was] based upon non-sex related acts or crimes committed against a child."

IV.   **DEFENDANT GREGOR'S HIRING BY DEFENDANT EPS AND HIS CONTINUING PREDATORY BEHAVIOR AT MOUNTAIN VIEW ELEMENTARY SCHOOL**

80.   Following SFPS' decision to provide Defendant Gregor with a neutral recommendation, he was hired by Defendant Espanola Public Schools (EPS) and began teaching for them the following school year, namely 2004-2005.

81.   Once employed by Defendant EPS, Defendant Gregor's predation on his female students continued unabated.

82.   Defendant Gregor began his tenure at Defendant EPS at a small school called Mountain View Elementary in the tiny town of Cordova, New Mexico, serving Cordova and the surrounding villages, including Truchas.

83.   C.M. was a young girl in Defendant Gregor's combined class of 3rd and 4th graders at Mountain View Elementary during the 2004-2005 school year.

84.     Defendant Gregor knew C.M.'s father had died when C.M. was in kindergarten, and he befriended C.M.'s grandmother, who volunteered at the school, telling her that C.M. was stressed due to the death of her father, and that he could help her.

85.     He also talked to C.M.'s mother about being able to help C.M. get over her 'anger' over the fact of her father's death by using acupuncture, and he tried to convince her mother to bring C.M. to his home so he could 'treat her.'

86.     C.M. remembers that Defendant Gregor would show the class photos and videos of a woman he said was his wife in the Philippines.

87.     The woman was very young and pretty, and she wore cute little dresses and high heels in the photos.

88.     Defendant Gregor had a jar of candy in his classroom, and he would let C.M. pass candy from the jar out to the other children.

89.     He would also let her be the "line-leader," and lead all the other children out of class for lunch; let her pick up papers from the other students and grade their work; and let her walk around the class and hand out pencils and return graded papers.

90.     During class, Defendant Gregor would often hold C.M. on his lap.  He would call her over to him, especially during 'story time,' and pull her into his lap.

91.     Sometimes he would hold an open book in his lap in such a way that their pelvic regions would be concealed.

92.     Defendant Gregor's chair was large and old, and had wheels and rocked back. It was brown – stained and gross – and he seemed to love it.

93.     Defendant Gregor would hold C.M. in his lap with one hand and would rub her with his other hand.  He would put his hands on her legs and rub her legs.

94.     He held other girls in C.M.'s class in his lap, too, though never any of the boys.

95.     C.M. who had tended to wear dresses at that age, began to be scared to wear dresses or anything that left her underwear exposed – so she started wearing jeans or other pants or shorts.

96.     He held her in his lap a great deal, and he would touch her whenever she was in his lap.

97.     Defendant Gregor's face would get very flushed when he held her in his lap – according to C.M., he was not angry, but his face was flushed.

98.     He would frequently get angry and yell at the class over random things, frightening the students.

99.     When C.M. went to his desk for help with her work, he would pull her into him, in between his legs.  He would rub his hand up and down her back.

100.    Then, on February 15, 2005, an instructor at Mountain View reported to the principal, Felix Gonzales, that Defendant "Gregor was getting too friendly with a third grader."

101.    She reported that he had the student sitting on his lap; that the student was stroking his cheek; and that he was actively seeking for that student to be hear him.

102.    She said four older girls, students in the combined 5th and 6th grade class, reported this behavior to her.

103.    Mr. Gonzales put Defendant Gregor on paid administrative leave, contacted CYFD, and investigated by having the counselor at the school, Cheryl Monks, speak to the

students who reported the behavior.  Apparently, she did so the same day the behavior was reported.

104.    The next morning, February 16, 2005, Mr. Gonzales and Ms. Monks met with C.M.'s mother "to explain the concerns."  C.M.'s mother was told that Defendant Gregor had held C.M. in his lap and that they – the principal and the counselor – were going to do something about it.

105.    The next day, February 17, 2005, the counselor met with C.M. alone.  C.M. was told that "other students had told their teachers that she [C.M.] had been being accused of being inappropriate."  Understandably, C.M. defended herself from these accusations of her purported misconduct.

106.    After this episode, Defendant Gregor was aggressive and angry towards C.M.; would physically push her away; no longer allowed her to be "line-leader" and would send her to the back of the line; and no longer asked her to pick up or pass out papers, or to hand out candy or pencils.

107.    The episode involving Defendant Gregor's sexually inappropriate behavior with C.M. was documented and reported to CYFD, which elected to take no action.  It was not reported to law enforcement.  No forensic interview was conducted of C.M.

108.    Following the incident, Defendant Gregor transferred from Mountain View Elementary for another school within Defendant EPS, Fairview Elementary.

109.    Defendant Ruby E. Montoya was the principal at Fairview Elementary School in Espanola, where Defendant Gregor began teaching second grade in August of 2006.

## V.    DEFENDANT MONTOYA'S FELONIOUS BACKGROUND AND RELATIONSHIP WITH HER SEXUAL PREDATOR HUSBAND, JIMMY

110.    Defendant Montoya began working for Defendant EPS in 2001.  She worked as a first-grade teacher at Sombrillo Elementary for one year, then became the Principal of Velarde Elementary for three years.  In the summer of 2004, she became the Principal of Fairview Elementary.

111.    More recently, on November 16, 2017, Defendant Montoya pleaded guilty to Unlawful Conversion of Government Property.  She has admitted under oath that her felony conviction resulted in her forced retirement from her position as Principal of San Felipe Elementary School.

112.    During the relevant time period, Defendant Montoya's husband, Jimmy Montoya, was a schoolteacher with a history of sexual misconduct with students at multiple schools.

113.    Indeed, in August 1999, Jimmy Montoya's Elementary K-8 and Athletic Coach 7-12 licenses were suspended by the New Mexico Board of Education for one year.

114.    The suspensions were based on allegations of inappropriate touching of students by Mr. Montoya over a period of several years, including that:

    a.    Two separate Socorro, NM Police Department incident reports identified Mr. Montoya as a "suspect" who inappropriately touched two different female elementary school students while working as a teacher at Zimmerly Elementary School, following which Mr. Montoya resigned from the Socorro School District;

b.  While serving as a teacher at Santa Rosa Middle School during the 1993-1994 school year, the principal of that school received complaints that Mr. Montoya inappropriately touched a 14-year-old female student, and inappropriately touched and made inappropriate remarks to four other students;

c.  While serving as a middle-school teacher and coach at the Anton Chico School during the 1997-1998 school year, the principal received complaints that Mr. Montoya "swiped two female students across their buttocks," ran his hand down another girl's back, and "that other female students were also complaining about his touching"; and that

d.  An internal investigation at Anton Chico subsequently concluded that Mr. Montoya "was engaging in a lot of touching of girls," who felt uncomfortable around him, following which Mr. Montoya was terminated.

115.    Following the reinstatement of his teacher's license, Jimmy Montoya resumed teaching, this time in EPS.  Allegations of sexual misconduct with students again followed.

116.    In 2012, Jimmy Montoya was indicted on nine counts of "criminal sexual contact with a minor (child under the age of 13)" and battery.  The charges related to Montoya's alleged molestation of nine female elementary school students over the 2011-2012 school year, while working as a bilingual schoolteacher at Sombrillo Elementary in EPS.

117.    Mr. Montoya eventually entered into a plea deal with prosecutors whereby Mr. Montoya pled no contest to six counts of misdemeanor battery and the "criminal sexual contact of a minor in the third degree (child under 13)" charges were dismissed.  Mr.

Montoya received a sentence of three years' supervised probation and also agreed to make restitution to his victims on all charges, whether or not dismissed.

118.    EPS also settled at least five separate civil lawsuits brought by victims of Mr. Montoya.

119.    Mr. Montoya's teaching license was revoked in 2012, after he declined to challenge pending revocation proceedings against him, following the institution of criminal proceedings against him in connection with his alleged molestation of nine students at Sombrillo Elementary.

120.    According to Defendant Montoya, it never occurred to her, during the time she worked in the EPS school district with her husband, that he might continue to engage in the type of behavior that resulted in his earlier suspension; and never occurred to her that her husband should not continue to teach elementary school girls.

121.    Defendant Montoya never discussed her husband's behavior with him, and never brought any concerns about his behavior to the attention of anyone at any of the school districts where she and her husband worked.

122.    Indeed, Defendant Montoya has stuck by her husband Jimmy through his many travails and has testified that if she would call anyone a good man, it would be him.

123.    The New Mexico Public Schools Insurance Authority paid six settlements totaling $890,000 over a two-year period to the families of students named as victims in a years-old lawsuit against their former teacher, Jimmy M. Montoya.

## VI.   DEFENDANT MONTOYA'S FACILITATION OF DEFENDANT GREGOR'S TRANSFER TO FAIRVIEW ELEMENTARY AND DEVELOPING FRIENDSHIP WITH HIM

124.   Defendant Montoya and her husband went to the home of Defendant Gregor and Judith for meals, and had Defendant Gregor and his wife over to their home for meals.

125.   Jimmy Montoya and Defendant Gregor were in the same math and science master's degree program, and spent a great deal of time together after school hours and on Saturdays, ostensibly studying at one another's homes or in one of their classrooms.

126.   Jimmy Montoya and Defendant Gregor studied together like this for at least two, and maybe as long as three, years.

127.   According to Jimmy Montoya, he and Defendant Gregor never looked at pornography together during their classroom study sessions because "[t]he school firewall would not allow it."

128.   In an email to a student, J.G.'s, grandmother, dated March 24, 2007, Defendant Gregor noted that "Our principal, Ruby Montoya, has been so wonderful to me. I'm working on a Master's degree on teaching math and science…and her husband is my study partner. She's going to be my wife's companion when her husband and I are studying."

129.   The two couples continued to socialize frequently, and Defendant Gregor reflected in an April 6, 2007 email to J.G.'s grandmother that "The principal is a good woman. I'm frequently over to her house. I became buddies with her husband last summer when we started the Master's program."  Defendant Gregor further noted how the greatest compliment he'd ever received was when Defendant Montoya informed him "that if her granddaughter was in our school she would have her in my class.  There are two other principals that want me to teach in their schools next year, but she won't let me go."

21

130.    Defendant Montoya has stated that she visited Defendant Gregor's classroom about every other week, in addition to conducting three yearly in-class evaluations, and occasionally visited his classroom to discipline students.

131.    Defendant Gregor describes Defendant Montoya as always very supportive of him as a teacher, and in general, and she agrees with him.

## VII.    DEFENDANT GREGOR'S SEXUAL ABUSE OF STUDENT J.G. IN 2006-2007, AND DEFENDANT MONTOYA'S INVOLVEMENT IN HIS MISCONDUCT

132.    In Defendant Gregor's first year of teaching at Fairview (the 2006-2007 school year), J.G. was among his second-grade students.  She was just seven years old when the school year began.

133.    Defendant Gregor began giving J.G. several gifts, including a pink and purple bicycle, a camcorder to record her softball games, an MP3 player, and stuffed bears.  He also gave her a Hello Kitty t-shirt and matching pants, and tried to give her "a little spending money," which her mother refused.

134.    He befriended her maternal grandmother and great-aunts, and invited her and her grandparents over for dinner with him and Judith.

135.    Defendant Gregor instituted a practice of class elections in his classroom, and J.G. was "elected" President of the class.  As President, J.G. sat on a chair with wheels at Defendant Gregor's desk, where she had constant access to a drawer he kept full of candy.

136.    Her place was with Defendant Gregor, at his desk.

137.    It was while sitting at his desk with him that the abuse began.  Defendant Gregor would place his hand on J.G.'s thigh, repeatedly, every day after she became President, while the other students were doing their school work at their desks.

138.    The students' desks were arranged in groups of about four, and Defendant Gregor would grope J.G. while the other students were occupied with their work.

139.    Defendant Gregor would keep J.G. in the classroom with him when the other children went to recess and to lunch.

140.    He would lock the door to the classroom when she was in there alone with him.

141.    They would sit together at his desk, and he would tell her that they were going to grade papers together.

142.    Defendant Gregor told her that if anyone came in the classroom while they were in there together, she should move her chair (on wheels) to the other side of the desk.

143.    Defendant Gregor sometimes told J.G. "Let's take a quick nap" during recess and over the lunch hour.

144.    There was an area rug in the classroom that the students sat on when Defendant Gregor read to the class.

145.    The rug depicted the letters of the alphabet with corresponding images, such as the letter "A" matched up with a picture of an apple.

146.    During these "naps," Defendant Gregor would position J.G. on the rug in front of him.

147.    He would lay her down on her side and position himself behind her, with his arm draped over her body.

148.    His pelvis would be up against her buttocks and upper thighs.

149.    J.G. could feel him rubbing something hard, his erect penis, up against her buttocks and her upper thighs during these "naps."

150.    J.G. recalls feeling Defendant Gregor's body "being pushed in me" during these

encounters.

151.   Defendant Gregor had her take these "naps" with him during recess and the lunch hour regularly during that school year, but not every day.

152.   Defendant Gregor would also ask J.G. to pick out items she liked so he could buy them for her.

153.   He would place J.G. in his lap while they searched for the right bicycle for her on the computer.

154.   They found a bike, which Defendant Gregor ordered and had shipped to a local store, where J.G. and her grandmother later picked it up.

155.   Defendant Gregor told J.G. that he wanted a daughter like her, and that he couldn't wait for her to come to his house and see the room he had set up for her.

156.   In point of fact, the childless Defendant Gregor had decorated an extra bedroom in the home he shared with his wife with a small pink bed, heart-shaped pillows, stuffed animals and other feminine decorations appropriate for a little girl.

157.   Judith Gregor explained to certain of her husband's female students that the room was for them.

158.   According to Defendant Montoya, an art teacher named "Ms. Lorraine" reported to her, during the 2006-2007 school year, that Defendant Gregor had a female student in his second-grade class sitting by him the entire time the other students were engaged in an art project, and that he would not let the little girl participate in the art activity.

159.   That art teacher was Lorraine Hyde, who worked for Fine Arts for Children and Teens, and through that organization taught art at Fairview Elementary School in Espanola.

160.   The student was J.G.

161.    According to Ms. Hyde (who is the aforementioned "Ms. Lorraine"), she informed Defendant Montoya, in the Fall of 2006, that she had observed several things about Defendant Gregor's classroom and his conduct towards a female student which caused her great concern, including:

a.    Defendant Gregor kept all the blinds in his classroom closed.

b.    Defendant Gregor had a female student, J.G., seated in a desk located next to him, hidden from view behind his desk, leg to leg, so close that her desk touched his chair.

c.    Defendant Gregor challenged Ms. Hyde when she made a move to open the blinds.

d.    When Ms. Hyde asked why J.G. was sitting so close to him, Defendant Gregor responded that J.G. was the President, so she was required to sit next to him.

e.    When Ms. Hyde gathered all the students near the blackboard to begin the art lesson, Defendant Gregor would not let J.G. join the other children, stating that she "stays with me."

f.    Ms. Hyde protested that J.G. needed to join the others to participate in the lesson, and eventually Defendant Gregor relented.

g.    J.G. briefly joined the other students, then returned to her seat next to Defendant Gregor after the demonstration.

h.    The students then gathered around tables to work on art projects, and, again, Defendant Gregor refused to let J.G. leave his side, stating "she can't do that, she sits by me."

i.    Again, Ms. Hyde insisted, and J.G. came out from behind Defendant Gregor's desk, but she seemed to be cowering and reluctant to do so.

j.    The other students seemed to be afraid for J.G., and began explaining to Ms.

Hyde that J.G. had to stay behind the desk, next to Defendant Gregor, because she was the President.

k.     J.G. sat down, but she sat down facing Defendant Gregor and put her feet up on her chair, with her knees bent. She was wearing a dress.

l.     Defendant Gregor then came directly over to J.G., put his body up against hers, and began speaking to her about what she was going to do.

m.     Observing sexualized behavior on the part of J.G., and the possessive, sexual, and utterly inappropriate conduct of Defendant Gregor towards J.G., Ms. Hyde tried to defuse the situation by moving J.G. to a different part of the table.

n.     Defendant Gregor continued to stand near J.G., repeatedly touching her, placing his hands on her arms and shoulders, as J.G. behaved in a way that seemed unwell, and repeatedly showed Defendant Gregor her artwork.

162.     According to Ms. Hyde, she reported all of these observations, immediately following her instruction in Defendant Gregor's classroom, to Defendant Montoya.

163.     According to Ms. Hyde, Defendant Montoya told her that she had previously "warned [Defendant Gregor] that if he kept closing the blinds and keeping that student's desk behind his that people would ask questions."

164.     Ms. Hyde asked Defendant Montoya if she was making unannounced visits to check on the situation, and Defendant Montoya said she was not.

165.     Ms. Hyde was so disturbed by this and by what she observed that she told Defendant Montoya that Defendant Montoya needed to call law enforcement and the parents of J.G. immediately.

166.     According to Defendant Montoya, she called her "supervisor" (who she believes

was Superintendent Cockerham at the time) and they conducted an investigation, during which she issued a "letter of leave" to Defendant Gregor.

167.    According to Defendant Montoya, though she reported Ms. Hyde's allegations to them, J.G.'s parents "didn't believe anything of what [Defendant Montoya] was saying because Dr. Gregor was their friend and they have invited him into their home."

168.    According to Defendant Montoya, when J.G. was questioned, she reported that she was "the President and she always sat there."

169.    Defendant Gregor, had, in fact, ingratiated himself to the family of J.G., frequently communicating with her and her grandmother, including by email.

170.    Defendant Gregor's wife, Judith, would also email J.G. herself, and encourage her to visit the couple at home.

171.    When Ms. Hyde raised her concerns, Defendant Gregor took steps to reassure J.G.'s grandmother, telling her (in an email dated May 3, 2007), "I remember now what I was talking to [J.G.] about when the art teacher thought I was holding her closer to me than she deemed appropriate for a teacher with a student….The reason I was holding Jane Doe 1 close to me when I was talking to her was because I considered it a private conversation and I didn't want the class hearing it."

172.    He succeeded in convincing J.G.'s grandmother, and gratefully emailed her the next day, May 4, 2007, thanking her for her support, and telling her, "The principal went 'to bat' for me. She said I was a person of high moral character and she had absolutely no concerns about me.  This seems to have solved the problem."

173.    Days later, however, Defendant Montoya went to his classroom, apparently because of concerns raised by another teacher, and found Defendant Gregor's door locked

during the lunch hour. Defendant Gregor describes the ensuing events to J.G.'s grandmother

in an email dated May 7, 2007, as follows:

> I'm going to try to explain what happened and if you don't want me around
> anymore I perfectly understand. The last time I was home was Thursday
> morning. From Thursday morning until Monday morning I had worked 70 hours
> at jobs (which is not usual so I was obviously tired and not thinking as clearly
> as maybe I should have.) [J.G.] came in this morning a few minutes before the
> bell rang and showed me her eye. She wanted to talk about her eye, but with
> class starting we didn't have a chance. I felt it was important for her to talk to
> me and I figured recess would be the only time we would have.  I thought if I
> could talk to her for a few minutes and get her out the door it should be ok. Well,
> obviously I was wrong. The reason I keep my door locked at recess is because
> I've been having students coming in when they're not supposed to it [sic] and it
> can get annoying. I was told that [J.G.'s] father was concerned that the door was
> locked, but I figured if she's going to be in my home I guess I didn't see the
> difference. I like these times when [J.G.] and I can sit together and talk (which
> we haven't had much time lately). I asked her if she wanted me to come to her
> games and she assured me she did. While we were talking there was a knock at
> my door. There's always students knocking on my door, but I could tell this time
> it was an adult and I knew with my (bad) luck it was probably the Principal. I
> thought if it was the Principal I was in big dutch (actually the word dutch means
> being in trouble with the boss) and to avoid getting in trouble I asked [J.G.] to
> go stand by the back closet hoping I could get rid of my visitor. (I would have
> been glad to go for a walk with [J.G.] instead of having her in my room, but I
> figured I would get in trouble for that, too.) It was obvious the Principal was
> looking for her so there was no use escaping the situation and I tried to do the
> best I could think of. Unfortunately, I got [J.G.] dragged in the mess which I
> highly regret. When the Principal called me into her office I told her how I
> believe with every fiber in my being that I'm supposed to be involved in this
> little girl's life. Ruby Montoya and her husband have been my close personal
> friends for the last several months so she knows me, but despite that she is a
> professional and she won't let friendship interfere with work so she said she
> needed to investigate the situation. She's also said she has no concerns
> concerning my character, but because of the complaint of the art teacher she had
> no choice. I went home and went to bed.
> Now, I'm going to tell you something that is sacred to me. When I was laying
> in bed in that half awake/half asleep condition some beings seemed to have
> appeared above me, announced they were angels, and said every thing [sic]
> would be ok. I know it sounds nutty that this could happen, but every time I
> think about it I get emotional (teary eyed). The Principal called to tell me I'm
> going to get my hand slapped for being insubordinate, but that I had been
> cleared. I jokingly took a big plastic baseball bat to her and said I deserved to
> be beaten with it. The Principal has told me that you're not happy with the

situation I put [J.G.] in (I wish I had never kept her in, but I thought it was important to talk to her and I'm always trying to push the envelope), but I want you to know that the mistakes I made were mistakes of the heart. The last thing I would ever want to do is hurt [J.G.]. I could tell by the way the Principal talked about meeting with [J.G.] that she was really impressed with her and I said 'I told you she was a great girl.' I won't come to her games if you think that's best. I made a mistake and I'm willing to pay the consequences.

174.    In point of fact, Defendant Gregor made J.G. hide from Defendant Montoya, who was indeed looking for J.G. in his locked classroom, because of the concerns raised specifically by Lorraine Hyde.

175.    As the other students came in from recess, Defendant Montoya counted them and found there was one student missing, at which point Defendant Gregor instructed J.G. to go out a different door in the class and to then pretend to come in through the door from the playground. She did, and Defendant Montoya quickly realized who had been missing in the first count.

176.    It is obvious from the email written by Defendant Gregor that Defendant Montoya realized that Defendant Gregor had, in fact, kept J.G. alone with him in his locked classroom during the lunch hour.

177.    However, despite all of this, J.G. was not sent for a forensic interview, and Defendant Montoya did not notify CYFD or law enforcement, nor did any other employee or agent of Defendant EPS notify CYFD or law enforcement.

178.    According to Defendant Montoya, she conferred with her supervisor, then-EPS Superintendent David Cockerham, and brought Defendant Gregor back to the school to resume teaching the day after she talked to the parents of the little girl.

179.    Defendant Gregor told J.G.'s grandmother, in an email dated May 12, 2007, that Defendant Montoya remained firmly loyal to him after discovering him alone in his locked

classroom with J.G., stating, "The Principal has been real good to me about it because she knows me. She is a first class professional."

180.   Defendant Montoya testified that Defendant Gregor ceased the behavior she referenced in her reports for the remainder of that school year, and "we didn't never have another problem in second grade with that."

181.   However, former EPS Assistant Superintendent Dr. Fidel Trujillo testified that Defendant Montoya informed him that "after she gave [Defendant Gregor] a directive not to have the officers sitting next to him, for a period of time he complied, but that she then observed that he was back in the practice of having the officers sit up next to his table."

182.   When Ms. Hyde, the art teacher, returned to Defendant Gregor's classroom the following week, she observed that the blinds were still closed; J.G.'s desk was still next to Defendant Gregor's chair, behind his desk; and that the behaviors between J.G. and Defendant Gregor were similar to the behaviors she witnessed during her earlier experience in his classroom.

183.   Defendant Montoya then called Ms. Hyde into her office, with Defendant Gregor present, and told Ms. Hyde that she had relayed Ms. Hyde's concerns about Gregor to Gregor himself.

184.   Defendant Gregor then challenged Ms. Hyde, and told her that he was good friends with J.G.'s parents, so Ms. Hyde had nothing to worry about.

185.   Ms. Hyde felt like she was in jeopardy, and she stated to both Defendant Gregor and Defendant Montoya that she wanted the police to be called, and that she wanted her report to Defendant Montoya to be documented and dated.

186.   No one from law enforcement or CYFD ever contacted Ms. Hyde.

30

187.    In addition to her demand of Defendant Montoya, Ms. Hyde reported her concerns to her supervisor, Julia Bergen, the Executive Director (at that time) of Fine Arts for Children and Teens.

188.    Ms. Hyde informed Ms. Bergen that she feared Defendant Montoya would not take appropriate action concerning Defendant Gregor.

189.    Ms. Bergen then spoke directly to Defendant Montoya about Ms. Hyde's report, and, based on that conversation, was also afraid Defendant Montoya would not act.

190.    Ms. Bergen contacted CYFD with her concerns, and the concerns expressed by Ms. Hyde, by calling and reporting those concerns to the CYFD Hotline.

191.    No one from law enforcement or CYFD ever contacted Ms. Bergen.

192.    Although the circumstances of their meeting are unclear, Superintendent Cockerham admits that he personally discussed Lorraine Hyde's allegations with Defendant Montoya.

193.    Superintendent Cockerham has testified that Defendant Montoya acted appropriately in conducting and resolving her own investigation into the allegations reported by Ms. Hyde without reporting those allegations to CYFD.

194.    According to Superintendent Cockerham, "[if] the blinds [in Defendant Gregor's classroom] were open" after his meeting with Defendant Montoya, then Defendant Montoya "has no further need to do anything beyond that time because [Defendant Gregor] took the direction to do what he needed to do."

195.    Per Superintendent Cockerham, Defendant Montoya had no duty to report Ms. Hyde's concerns about Defendant Gregor's bizarre behavior towards J.G. unless the alleged misconduct "hit the threshold" of suspected child abuse in Defendant Montoya's "personal

opinion," because perceptions of sexualized conduct towards schoolchildren are "very subjective."

196.    According to Superintendent Cockerham, the duty to report suspected child abuse is entirely within the discretion of the EPS employee who learns of the possible abuse.

197.    Superintendent Cockerham has testified that he did not even ask Defendant Montoya whether the report involving J.G. met her threshold "of needing to contact the State," because he "felt that it was her responsibility to make that decision."

198.    Superintendent Cockerham acknowledges that he was made aware of Defendant Montoya's so-called investigation, and that he did nothing to follow up or investigate further after the investigation was resolved by Defendant Montoya with no consequences for Defendant Gregor.

199.    Superintendent Cockerham admits that no report of Ms. Hyde's allegations regarding Defendant Gregor's behavior was made to the Public Education Department.

200.    In the summer after J.G.'s second-grade year, Defendant Gregor wrote to her grandmother that "It's like being very hungry and only being able to have a little bit of a delicious meal.  I really want to be with [J.G.], but only seeing her for a few minutes is not very satisfying."

201.    After Defendant Gregor switched from teaching second grade to teaching fourth grade, he wanted J.G. to be in his classroom.

202.    J.G. was in the fourth grade during the 2008-2009 school year.

203.    J.G. did not want to be in his classroom again, so her grandmother told Defendant Gregor that J.G.'s parents were not comfortable with her being in his class.

204.    Defendant Gregor, according to him, had her placed in a different classroom.

205.    Defendant Gregor describes to J.G.'s grandmother, in an email dated May 8, 2007, how "if [children] don't get good touch they're going to seek any type of touch because they need to be touched."

206.    By that point, Defendant Gregor had moved on from his predation of and obsession with J.G. to predating upon and obsessing over various fourth-grade girls he taught during the 2007-2008 and 2008-2009 school years.

207.    He wrote in an email on September 8, 2007 to J.G.'s grandmother, "When I first started teaching I felt that you had to reach girls before 6th grade if you wanted to hopefully have a positive lasting influence on their lives. Now I believe conditions have changed so that it has to be before 5th grade (I'm talking in general terms, of course)….[N]ow that I'm teaching 4th grade, even though the boys seem to like me it's only the girls that want to give me a hug or hold my hand when we're walking someplace."

208.    To this day, J.G. suffers from anxiety attacks, confusion, and turmoil as a result of her sexual abuse by Defendant Gregor. She lives in fear that people will find out there is something "wrong" about her, and faults herself for not understanding what was happening to her as a child.

## IIX.   DEFENDANT GREGOR'S SEXUAL ABUSE OF MULTIPLE STUDENTS DURING THE 2007-2008 SCHOOL YEAR, AND DEFENDANT MONTOYA'S INVOLVEMENT IN HIS MISCONDUCT

209.    For the 2007-2008 school year, Defendant Gregor was moved to fourth grade. In an email to J.G.'s grandmother written early in the school year, he opined that when he began teaching, he "felt that you had to reach girls before 6th grade if you wanted to hopefully have a positive lasting influence on their lives. . . . And if I'm sitting in front of the class reading with them, the girls want to sit by me as if being near me brings them some kind of

comfort.  I think if I want to have a lasting influence on them now's the time."

210.    Among his students that year were four who became his habitually "elected" class officers: Nallely Hernandez,[1] A.L., K.S., and V.S.

211.    Like J.G. before them, Defendant Gregor gave these class "officers" many gifts, including teddy bears, candy, chocolates, sodas, notebooks, t-shirts, and, in some instances, cell phones.

212.    He also continued the practice of closing his blinds and seating these select female students next to him during and throughout the 2007-2008 school year – a practice that Defendant Montoya had supposedly ended the year before.

213.    Defendant Gregor used his access to these girls to touch them at his will throughout the day, every day.

214.    In an e-mail from September 2007, Defendant Gregor noted that "[o]ver half my class is already much attached to me and they think of me as their daddy (and I have to tell them to give me space).  I really think that's why I'm supposed to be a school teacher and why God has kept me in this occupation."

*Student Nallely Hernandez*

215.    During the first month of the 2007-2008 school year, Defendant Gregor began touching Nallely Hernandez (described as Student A during the PED hearing).

216.    Ms. Hernandez told her friends about it, and several of them said "he did the

---

[1] Ms. Hernandez, who settled a prior lawsuit against these same Defendants, elected to go public with her story and is thus not referred to by her initials.  *See Hernandez v. Espanola Public Schools, et al.* (No. 1:16-cv-01117-JB-SCY) (D.N.M. 2016);

same thing to them."

217.    Defendant Gregor gave Ms. Hernandez lots of candy, teddy bears, and art sets, and he gave candy, teddy bears and art sets to the other "council" members, too.

218.    Defendant Gregor told Ms. Hernandez to stay in the classroom after the bell rang, and kept her there, alone with him. He asked her to go into the closet with him. He said he wanted to kiss her.

219.    Knowing she was in there alone with him, her friends would wait for her outside of the classroom door.

220.    When Defendant Gregor touched Ms. Hernandez he told her not to tell anybody, or else. He said he knew her family, and where she lived. His threats scared her.

221.    When Ms. Hernandez wore skirts, Defendant Gregor would touch her on her inner thighs and, eventually, her vagina.

222.    She stopped wearing skirts, but Defendant Gregor would put his hands inside her pants, pushing down under her belt, in order to fondle her.

223.    Ms. Hernandez saw him do these things to her friends, including A.L., as well.

224.    Ms. Hernandez and three of her friends, Jane Doe 4 among them, went to Defendant Montoya during the school year to report to her that Defendant Gregor was touching their "legs" in a way that made them uncomfortable.

225.    Ms. Hernandez considered her legs, especially her inner thighs, to be 'private parts,' and the girls agreed before they went to report to Defendant Montoya that they would use the word "legs."

226.    Defendant Montoya told the girls, in response, that she knew Defendant Gregor very well, that he was a good friend of hers, and that she knew he would not do that.

227.    Soon after the girls reported the touching to Defendant Montoya, Defendant Montoya came to their classroom and told Defendant Gregor that she wanted to speak to his class. She then told the four girls who came to her office, along with all of their classmates, that they should not make false accusations – that they should not lie about things like that. During this speech, Defendant Gregor appeared to be angry.

228.    After this, Ms. Hernandez did not trust Defendant Montoya and did not communicate with her again.

229.    Ms. Hernandez understood that Defendant Montoya was calling her and Defendant Gregor's other victims liars, and she was humiliated, angry, and uncomfortable.

230.    After Defendant Montoya's speech to his class, Defendant Gregor temporarily modified his behavior. He stopped giving the girls gifts and candy, he gave the class a lot of work, and he stopped touching the girls, for a short period of time, maybe less than one week.

231.    However, once the abuse continued, it escalated.

232.    During the year, his touching went progressively higher up her leg and lasted longer, and he would have her – and the other girls – sit on his lap.

233.    The touching progressed until Defendant Gregor was touching Ms. Hernandez' vagina, "scooping" inside her labia, rubbing her with his fingers.

234.    Defendant Gregor presumably did the same thing to the other girls that he did to Ms. Hernandez.

235.    Whenever Ms. Hernandez would get so uncomfortable that she wanted to act out, Defendant Gregor could tell, and he would whisper threats in her ear. He would do the same thing to the other girls he abused. This happened almost every day.

236.    Defendant Gregor called Ms. Hernandez on the telephone, once or sometimes

twice a day, using her mother's cellular phone.

237.    Defendant Gregor came to her home, asked her mother if he could take Ms. Hernandez to the store with him and buy her a cellular phone of her own, and her mother said "yes."

238.    According Ms. Hernandez' mother, Defendant Gregor would call her daughter and speak to her for 15 or 20 minutes, while she would stand outside of her daughter's bedroom door and listen.

239.    Defendant Gregor repeatedly told Ms. Hernandez "I love you," and this made her uncomfortable.

240.    Later that school year, Defendant Gregor "borrowed" her phone from her and never gave it back.

241.    Defendant Gregor invited Ms. Hernandez to spend the night at his home, and he would ask her what she was going to wear and what she wanted him to wear.

242.    According to the mother of Ms. Hernandez, all of her daughters spent the night at Defendant Gregor's home twice.

243.    Ms. Hernandez slept over at his house all night, at least once, with her younger sisters, and observed how the childless Defendant Gregor had a room in his home decorated as if it was a little girl's room, with a girl's bedspread, heart-shaped pillows and teddy bears, and a closet full of girls' toys.

244.    Ms. Hernandez remembers that Defendant Gregor sent his wife to bring Ms. Hernandez to him in his bedroom when she was there for the night with her sisters. She remembers that he was wearing grey and blue striped pajamas, and that he told her to get into the bed with him. She refused, telling him she had to sleep with her sisters or they would be

afraid, and left the room.

245.    When Defendant Montoya was asked whether any parent complained about the fact that Defendant Gregor had Ms. Hernandez (and her sisters) stay at his house overnight, Defendant Montoya replied: "No. I saw the children there myself….It was one Saturday….They were there. The children were there."

246.    Despite later admitting that she could not think of a legitimate reason why Ms. Hernandez and her little sisters should be at Defendant Gregor's personal residence, Defendant Montoya admittedly took no action whatsoever upon observing the children at Defendant Gregor's home on the weekend.

*Student K.S.*

247.    Ms. Hernandez' classmate K.S. (described as Student B during the PED hearing) was sexually abused by Defendant Gregor that same year (2007-2008), after she became designated as the class secretary and was assigned the seat next to Defendant Gregor.

248.    Prior to that, she had been the president or the vice-president, but it was when she was designated secretary, in or near late September of 2007, that she had to sit right next to him, and he began to touch her.

249.    Defendant Gregor rotated the positions of his female students every month, from one officer to another, so the girl who was secretary would be seated next to Defendant Gregor for about one month, continuously.

250.    K.S. was the secretary three different times that year, or more, so she sat next to Defendant Gregor for three entire months, or more.

251.    Defendant Gregor touched K.S. every single day that she was seated next to him.

252.    He touched both her legs, inside her thighs, and touched her vagina; he put his thumb or fingers inside her pants to touch her on her bare skin; he put his hand up her skirt (when she wore a skirt) to touch her on her bare skin; he kissed and licked her ear; and he would hold her hands.

253.    Once, when K.S. wore a skirt, Defendant Gregor put his hands up underneath it and pulled it up in order to touch her bare skin (apparently her inner thigh and vagina).  K.S. told him she did not want to be the secretary, or any other officer, any longer, but he forced her to stay seated where she was, because, he told her, there were no more desks in the classroom.

254.    On one occasion, Defendant Gregor kept K.S. inside the classroom with him when all the other students left for recess.

255.    Her friends told her, before they left, that they would be waiting by the two windows.

256.    Alone in the classroom, Defendant Gregor whispered in K.S.'s ear and licked or kissed it.

257.    One of K.S.'s friends, A.L., ran into the classroom and said that the principal wanted to see K.S.

258.    A.L. used this subterfuge in order to protect K.S. and get her out of the room.

259.    On another occasion, K.S. saw Defendant Gregor putting his thumb inside the pants of A.L., under the table, the same way he put his thumb inside the pants of K.S.

260.    Defendant Gregor touched in the manner she described, by her estimate,

between 300 and 500 times during the 2007-2008 school year.

261.    K.S. was scared to tell her parents. She was frightened by the way he touched her, and she was frightened by the way he reacted when she asked to be moved from the secretary position.

262.    Defendant Gregor punished K.S. when she asked to be moved by giving her a 'B' instead of an 'A' on a math test, marking a question wrong which she actually answered correctly, and which she knew she answered correctly. She checked her answer with a friend, who had the same answer, and it was marked as correct.  When she tried to point it out to him, he told her she was wrong.

263.    Sometimes Defendant Gregor, when he had K.S. close to him, would put a large book up, balanced on its spine, so that nobody could see them behind the book, and then talk directly into her ear, which made her uncomfortable.

264.    K.S. does not recall going to the office with Ms. Hernandez, A.L., and the other girls, but she does recall that one of her friends went to Defendant Montoya's office during the 2007-2008 school year to report the touching.

265.    K.S. does not disagree with the recollections of Ms. Hernandez. She herself has tried hard to forget much of what happened, and remembers hearing about the touching being reported as opposed to being part of the group reporting the touching.

266.    Indeed, K.S. specifically recalls how Defendant Montoya came into the classroom after the report and demanded the children stop lying about Defendant Gregor.  She reported this incident to her aunt some years later.

267.    On numerous occasions, Defendant Gregor asked K.S. to come over to his house to spend the night. He would ask her this at least three or four times each week, and he would give her pens which had his name and telephone number on them.

268.    Defendant Gregor asked K.S. to sleep with him, asked her what she would wear to his house, and asked her what she wanted him to wear.

269.    K.S. never went to Defendant Gregor's house.

270.    K.S.'s father came to eat lunch with her many times during the 2007-2008 school year.

271.    On one occasion, Defendant Gregor slid her chair away from him when her father walked into the classroom. He also did that on one occasion when her mother walked into the classroom.

272.    Defendant Gregor gave K.S. gifts, including a large teddy bear holding a basketball, and coloring sets.

273.    Defendant Gregor's wife, Judith, was sometimes in his classroom. One time she saw Defendant Gregor touch K.S., on her inner thigh, and she patted Defendant Gregor on the back and said something to him. Defendant Gregor whispered something to her, and she began to cry.

274.    At some point during the 2007-2008 school year, the students in Defendant Gregor's class "purposely and strategically elected all boys as class officers."

275.    During lunch recess, the girls who had been victimized went to the boys in the class and asked them to elect all boys, and the boys went along with the plan.

276.    Defendant Gregor refused to honor that result, claiming it was not fair, that some girls had to be elected too, and held another election.

277.   There were times when the only class members elected as officers were girls, but Defendant Gregor never refused to honor those results.

*Student A.L.*

278.   Defendant Gregor's abuse of A.L. occurred throughout the same time period, and followed the same pattern, as his abuse of K.S. and Nallely Hernandez.

279.   At first, A.L. really enjoyed getting attention from Defendant Gregor.

280.   She liked being President of the class, correcting students' papers, and helping.

281.   As President, A.L. was always given more of the candy that Defendant Gregor routinely threw out to the class.

282.   Later, after seeing that other girls were receiving the same treatment from Defendant Gregor, A.L. no longer felt special, and eventually felt confused and scared by his attentions.

283.   Defendant Gregor rubbed A.L.'s thighs, and he eventually began fondling her vagina, under her clothing.

284.   Defendant Gregor would grab A.L.'s hand and put it in his lap so that she could feel his penis growing hard.

285.   Defendant Gregor would pull A.L. into his lap.

286.   Defendant Gregor touched A.L.'s buttocks.

287.   After a while, Defendant Gregor "was always touching [A.L.] down there."

288.   Defendant Gregor threatened to harm A.L.'s family, and her, if she told anyone what was happening.

289.   He further threatened to not give her good grades if she didn't wear a skirt to

school.

290.    A.L. specifically recalls being one of the four girls who went to Defendant Montoya to complain about being inappropriately touched by Defendant Gregor, and being dismissed by her.

291.    In fact, Defendant Montoya never called any of the girls identified as being inappropriately touched by Defendant Gregor into her office to ask them about these reports, nor did she take any other action to investigate the reports.

292.    Instead, A.L. corroborates K.S.'s recollection that Defendant Montoya came into Defendant Gregor's classroom and told the entire class that it was not good to lie, it could get people into serious trouble, and that whoever is saying that stuff about their teacher shouldn't be lying.

293.    According to A.L. (described as Student C during the PED hearing) and her mother, A.L.'s mother discovered Defendant Gregor was calling her daughter from a telephone with a long-distance (310) area code, on a daily basis, sometimes many times a day.

294.    Once A.L.'s mother became aware of this, she would answer the telephone when Defendant Gregor called.

295.    Defendant Gregor offered to buy A.L. her own cellular telephone, but her mother refused this offer.

296.    Also during that year, A.L.'s mother discovered that Defendant Gregor was giving her daughter gifts, such as candy, art supplies, teddy bears, and a large pillow book.

297.    At some point during that year, A.L.'s mother became aware that Defendant Gregor had twice, to her knowledge, asked A.L. to spend the night at his home.

298.     During (or proximate to) April of 2008, A.L. came home crying. Her mother
asked her what was wrong and observed that A.L. was very scared. She told her mother "she
had to tell [her] something, but that it was very ugly." After much persuasion, A.L. told her
mother that Defendant Gregor had been touching her "in her private parts," and that he had
been doing this for a long time.

299.     A.L. went on to tell her mother that Defendant Gregor was also touching her
friends in class.

300.     The same day of A.L.'s disclosure, A.L.'s mother went to Defendant Montoya
about this, reported all of the misconduct, including the gifts, the invitations, the telephone
calls, and the touching, and told Defendant Montoya that she was going to go to the police.

301.     Defendant Montoya acknowledged that the mother of A.L. (Student C) reported
to her, in April of 2008, "that Dr. G. [Defendant Gregor] had touched her [A.L.] in her private
parts."

302.     According to A.L.'s mother, Defendant Montoya told her not to report
Defendant Gregor's actions to the police because she, Defendant Montoya, would "take care
of it."

303.     Defendant Montoya acknowledges that A.L.'s mother "said that if [Defendant
Montoya] didn't do something about it, [the mother] would go to the police."

304.     Defendant Montoya denies telling A.L.'s mother not to go to the police.

305.     At that time, nobody reported anything to the police, or to CYFD. Defendant
Montoya did not report these allegations to CYFD, and neither did any other employee of
Defendant EPS.

306.     Defendant Montoya told the mother of A.L. that other students had also

complained that Defendant Gregor had touched them.

307.   Defendant Montoya told A.L.'s mother that she would report this to the Superintendent of Defendant EPS.

308.   Defendant Montoya took no action whatsoever with respect to these allegations, except, as described, apparently discussing them with Defendant Gregor, and telling the students not to make up stories about their teacher.

309.   A.L. remained in Defendant Gregor's class, but after her mother reported Defendant Gregor's misconduct to Defendant Montoya, Defendant Gregor never spoke to A.L. again.

310.   Following her abuse by Defendant Gregor, A.L. suffered from nightmares, and could not bear the touch of her basketball coach the following year.

311.   In sixth grade, she began cutting herself to offset the symptoms of her distress and numb herself emotionally.

312.   A.L. remains deeply traumatized as a result of her sexual abuse by Defendant Gregor. She still finds it extremely difficult to allow anyone physically close or to touch her, has difficulty trusting herself or other people, has trouble concentrating, and feels "stupid" for being victimized as a child.

## IX.   **DEFENDANT MONTOYA IGNORES OTHER DISTURBING REPORTS ABOUT DEFENDANT GREGOR DURING THE  2007-2008 SCHOOL YEAR**

313.   In Fall of 2007 − the same school year that Defendant Montoya received complaints regarding Defendant Gregor's sexual abuse of several of his students, including Nallely Hernandez, K.S., and A.L. − she also heard multiple concerns expressed about

Defendant Gregor from a colleague, Ms. Jennifer Chavez.

314.    Jennifer Chavez was an Educational Assistant at Fairview.  Her daughter was a student there, and was in the same grade as Ms. Hernandez, K.S., and A.L..

315.    Ms. Chavez became concerned about Defendant Gregor's conduct with his students when she was on lunch duty in the cafeteria and observed him sitting between two girls with his hands under the table, for a few days.  While the girls he sat between varied each day, it would invariably be two of a group of four specific girls, namely A.L., K.S., Nallely Hernandez, or their classmate, V.S.

316.    Ms. Chavez brought these concerns to Fairview's principal, Defendant Montoya.

317.    In an e-mail from around this time, Defendant Gregor complained to J.G.'s grandmother that he used to eat lunch with J.G. and then with others, "but one of the staff complained that I shouldn't be so close to the students.  Mrs. Montoya advised me for my own protection not to eat with them anymore."

318.    A.L. recalls that Defendant Gregor touched her inappropriately under the cafeteria table during these lunches.

319.    According to Defendant Gregor, Defendant Montoya "didn't think it was fair [following Ms. Chavez' complaint] that my students weren't able to eat lunch with me[,] so she has told me to sit at an empty table and let the students sit by me rather than for me to sit by them, that way I can't be accused of favoring students.  As it is they seem to fight over who's going to sit by me."

320.    Ms. Chavez' daughter ended up regularly visiting Defendant Gregor's classroom as part of an exchange arrangement with another teacher, whereby Gregor taught

science and the other teacher, Ms. June Madrid, taught Spanish. According to Ms. Chavez, her daughter recounted to her how, during one of her visits to his classroom, Defendant Gregor told the students that it was "okay for an older man to have young wives and more than one wife," and he would call on the girls in the classroom for answers, then throw unwrapped candy at them and tell them to "Come sit by me."

321.    Ms. Chavez reported this to her daughter's teacher, Ms. June Madrid. According to Ms. Chavez, Ms. Madrid responded that she would try to avoid the exchanges, but she was later thwarted by Defendant Montoya, who said the exchanges had to continue. Consequently, Ms. Chavez told her daughter to keep her distance from Defendant Gregor whenever she was in his classroom.

322.    Defendant Gregor continued to ask the girls to answer questions, throw candy at them, and ask them to come and sit by him.

323.    According to Ms. Chavez, Ms. Madrid told her that she was not surprised by the reported behavior, and that she had heard things about Gregor as well. Ms. Madrid told Ms. Chavez that she had relayed her concerns to Defendant Montoya.

324.    Ms. Chavez herself reported her concerns directly to Defendant Montoya as well, detailing for her Gregor's comments about marriage, his behavior with the candy, and his disturbing treatment of the girls in his classroom.

325.    Ms. Chavez reported all of her concerns about Defendant Gregor – her concerns about his behavior with young girls in the cafeteria, and his bizarre comments and behavior in the classroom – to Defendant Montoya during the Fall semester, before Christmas break in 2007.

326.    Defendant Montoya immediately came to Defendant Gregor's defense.  She argued that Defendant Gregor was trying to tie his discussions about marriage into the science curriculum, but said that she would "look into" the throwing of candy and the asking girls to sit by him.

327.    However, Defendant Gregor did not change his behavior after it was reported to Defendant Montoya.  He continued to throw candy at the girls and ask them to come and sit by him.

328.    After making her report, Ms. Chavez remembers observing Defendant Gregor being summoned to Defendant Montoya's office, meeting with her behind closed doors, then emerging with a pie and giving it to Ms. Chavez as a Christmas gift.

329.    Defendant Montoya had seen Ms. Chavez in the copy room outside of her office before Defendant Montoya called Defendant Gregor to her office, and Ms. Chavez understood that Defendant Montoya gave Defendant Gregor the pie to give to Ms. Chavez, in an attempt to get her to back off of her complaints.

330.    Ms. Chavez remembers walking into Defendant Gregor's classroom to deliver a message to him one day, and noticing that he had all the girls sitting around him.

331.    Throughout that year, Ms. Chavez observed Defendant Gregor keeping K.S., Nallely Hernandez, A.L., and V.S. close to him, holding their hands while walking from the cafeteria to his classroom.

332.    Ms. Chavez is sure that she also told Defendant Montoya about the hand-holding behavior and her concerns about it, and that her response was always "I'll talk to him."

333.    Defendant Montoya has testified that she, too, saw Gregor holding his female students' hands.

334.    Based on his behavior, Ms. Chavez did not believe Defendant Gregor belonged around children.

## X.     DEFENDANT GREGOR'S SEXUAL ABUSE OF PLAINTIFF JANE DOE'S CLASSMATES DURING THE 2008-2009 SCHOOL YEAR, AND DEFENDANT MONTOYA'S INVOLVEMENT IN HIS MISCONDUCT

335.    During the 2008-2009 school year, Defendant Gregor continued to teach fourth grade at Fairview Elementary School.

336.    Among his students were Plaintiff Jane Doe and two of her classmates, E.A. and B.G.  Both E.A.'s and B.G.'s mothers would ultimately transfer them out of the class.

*Student E.A.*

337.    E.A. recalls that Defendant Gregor initially "presented himself in a nice way" – he told the students that he was a doctor and "right away discussed that he elected Presidents, Vice Presidents."

338.    However, E.A. "thought he was kind of odd" because of the different way Defendant Gregor ran his classroom, including by keeping the doors always closed and throwing chocolate raisins at the children if they answered his questions correctly."

339.    As in years past, the "class officers" would sit at a table with Defendant Gregor away from the other students' desks.

340.    E.A., a perennial class officer, never wanted to be President or Vice-President, so she and other students would get together to vote for her friend Cedric or other boys, with no change in the election results.  The students "thought it was odd that the girls were always President and Vice President."

341.    E.A. was always kept very close by Defendant Gregor.  She would sit on a chair

with wheels on it, next to him.

342.   E.A. also observed how Defendant Gregor was also very close to another female classmate, "hugging her or talking to her."

343.   Defendant Gregor asked Jane Doe 3 to stay in the classroom with him to help him "grade papers."

344.   Defendant Gregor paid E.A. many compliments, always telling her how pretty and smart she was.

345.   E.A. was "always elected" a class officer and B.G. was elected "the same amount."

346.   Defendant Gregor would ask E.A. to sit on his lap.

347.   Defendant Gregor would put his hands in E.A.'s hair, and tell her how much he liked it.

348.   From the very first time she was elected president, Defendant Gregor would sit close to E.A., "his face real close" to hers.

349.   He then put his hand on her in an "inappropriate" way.  He first put his hand on E.A.'s leg and then he moved it up her thigh, and began moving it even higher.

350.   When he spoke to E.A., he would get very close to her, so close that she could feel his breath on her neck and the warmth of his body, and she felt uncomfortable.

351.   When E.A. moved away from Defendant Gregor, he looked at her sadly and asked her to come back.

352.   Undeterred, Defendant Gregor continued to "always compliment" and try to befriend E.A.

353.   E.A. remembers Defendant Gregor's wife, Judith, coming to the classroom at

times and sitting on the other side of the room, apparently grading papers.

354.    E.A. remembers that Judith seemed very young and was small, and that Defendant Gregor, by contrast, seemed huge.

355.    Eventually, Defendant Gregor worked his way up to placing his hand on E.A.'s upper thigh and then slowly moving it over her clothes to her crotch, where he kept his hand until she stood up from her seat.

356.    E.A. reported at least some of Defendant Gregor's inappropriate touching to her mother.

357.    E.A.'s mother was initially pleased to hear that her daughter had been elected class president; she also recalls the family receiving multiple invitations to dinner at Defendant Gregor's house, relayed to her by E.A., though they "of course never went."

358.    E.A.'s mother was initially pleased to hear that her daughter had been elected President; she also recalls the family receiving multiple invitations to dinner at Defendant Gregor's house, relayed to her by E.A., though they "of course never went."

359.    Once her daughter came to her and disclosed Defendant Gregor's touching her and other inappropriate behavior – including Defendant Gregor's asking her to stay in the classroom with him and acting overly friendly with girls in his class - E.A.'s mother was in shock, but acted quickly.

360.    E.A.'s mother went to Defendant Montoya the next morning, and told her of all that E.A. had reported.  E.A.'s mother demanded an immediate transfer.

361.    E.A.'s mother confirmed that Gregor touched her daughter "on the crotch."

362.    Defendant Montoya replied that she had "never heard" any complaints against Defendant Gregor before.

363.    She urged E.A.'s mother to trust her and promised to handle the situation immediately, to include going into Defendant Gregor's classroom to monitor his behavior with his remaining female students.

364.    E.A.'s mother recalls telling Defendant Montoya that if Defendant Gregor had touched her daughter inappropriately, she was "pretty certain" he was doing it to other girls, because E.A. had not accepted his invitations to stay behind in his classroom during lunch, yet was still harmed.

365.    Defendant Montoya capitulated, and at E.A.'s mother's request, she permitted E.A. to transfer into a different teacher's fourth-grade class at Fairview Elementary.

366.    Defendant Montoya failed to follow through on any of her promises to E.A.'s mother, by reporting Defendant Gregor or addressing the reported abuse in any way.

367.    As a result of her sexual abuse by Defendant Gregor, E.A. is uncomfortable with male teachers and authority figures, and dislikes it when men are physically close to her.  She is suspicious of others' intentions, and has tried to avoid thinking about Defendant Gregor.

*Student B.G.*

368.    B.G. was also Defendant Gregor's victim in the 2008-2009 school year.

369.    Defendant Gregor began grooming B.G. for abuse back when she was in the second grade, in 2006-2007, when he was her history teacher, though not her full-time teacher - the same situation in which he taught Jennifer Chavez' daughter.

370.    During B.G.'s second-grade year, Defendant Gregor gave her and her friend "special gifts," including, in B.G.'s case, a teddy bear holding up a heart bearing the message

"I love you." He also provided her with other toys, coloring books, and coloring pencils, and gave her special attention in his classroom.

371. At Defendant Gregor's urging, B.G. would sometimes go into his classroom closet to choose her gifts.

372. B.G. saw Defendant Gregor kiss her friend and rub her friend on the back during recess, while the two girls were alone with him in the classroom.

373. During these special visits, Defendant Gregor would also give the girls bubble gum and lollipops.

374. Defendant Gregor seemed to be a "cool teacher" because he gave out candy and would give the class the answers to their assignments.

375. On one occasion, B.G.'s mother went to pick up her daughter at Fairview and could not find her among the other children, who were all outside playing. She asked a substitute teacher where her daughter was, and was told to "run to" Defendant Gregor's classroom, because the substitute teacher had seen that "he goes in there with another girl sometimes."

376. The substitute teacher further advised B.G.'s mother to tell her daughter not to go in the classroom with Gregor, "because that man is not a good man."

377. B.G.'s mother went looking, and saw B.G. emerge from Defendant Gregor's classroom with another girl, both of them carrying toys. B.G. looked unhappy.

378. B.G. told her mother that Defendant Gregor had told her and her friend to come to his class because he had toys for them over there.

379. Throughout this time, Defendant Gregor repeatedly invited B.G. to his house.

380. The next year, B.G.'s third-grade year, she would see Defendant Gregor around

the school grounds, and he would tell her that he wanted her in his class the following year.

381.    Once Defendant Gregor became her primary teacher in the fourth grade, B.G. was often voted "President" of his class.

382.    During the periods of time that she served as "President," she sat next to Defendant Gregor.

383.    Initially, B.G. felt excited to be given the privilege of a special role in class.

384.    Defendant Gregor praised her, and gave her extra portions of the sour bubblegum he threw to the class.

385.    Defendant Gregor would keep B.G. in the classroom during lunch, and he would close the door.

386.    He continued to offer her stuffed animals, coloring books, and pencils.

387.    In class, Defendant Gregor would pull B.G.'s chair next to his, which she initially thought was weird.

388.    Defendant Gregor would put his hand on B.G.'s thigh, and he would keep it there.

389.    He then began running his hand further up her thighs.

390.    B.G. remembers wearing a dress and experiencing Defendant Gregor putting his hand right up next to her vagina.

391.    Defendant Gregor put his hand inside her panties and began to rub her genital area.

392.    B.G. remembers that she became scared and tried to push him away, then got up and went to drink water to get away, at which point Defendant Gregor became angry with her.

393.   Defendant Gregor told her that she would no longer get any toys or treats.

394.   Defendant Gregor was mean and cold, and he would not allow her to go to the bathroom or to drink water.

395.   B.G. does not recall how many times Defendant Gregor sexually abused her.

396.   She eventually told him that she didn't want to sit with him and would like to sit with her friends.

397.   Defendant Gregor told her that she couldn't be President anymore, and immediately conducted an "election" to select a new President.

398.   B.G. stopped wearing dresses to school, even though she liked dresses and skirts better than pants.

399.   B.G. would come home from school crying, which caused her mother a great deal of concern.  When her mother asked her why she was so upset, B.G. told her that her teacher, Defendant Gregor, was mean to her and took her out of the President position, but did not admit that he was touching her inappropriately.

400.   B.G.'s mother recalled the rumors and warnings she had heard about Defendant Gregor.

401.   Jennifer Chavez had also spoken to B.G.'s mother and told her that she had heard that Defendant Gregor wanted to have B.G. come to his house, and that B.G.'s mother should not allow this to happen.

402.   B.G.'s mother went directly to Defendant Gregor to confront him, and he became very angry and pretended that he could not understand her, despite the fact that they had been able to communicate with no trouble in the past.

403.   B.G.'s mother then went to a secretary, who told her that it was not possible for her to get B.G. out of Defendant Gregor's class.

404.   B.G.'s mother then went to Defendant Montoya and explained that B.G. was very unhappy in Defendant Gregor's class.  Nevertheless, Defendant Montoya insisted that B.G. would have to stay in Defendant Gregor's class.

405.   Defendant Montoya did not attempt to speak with B.G. – who was present with her mother during the meeting – about why she was unhappy.  Rather, she insisted that B.G. needed time to "get used to it" – presumably, to get used to Defendant Gregor

406.   Defendant Montoya did not mention that she had already received complaints about Defendant Gregor's inappropriate touching of female students from (1) Lorraine Hyde, (2) Jennifer Chavez, (3) Nallely Hernandez, (4) K.S., (5) A.L., (6) A.L.'s mother, (7) V.S., (8) E.A., and (9) E.A.'s mother.

407.   She did not mention that she had fielded numerous complaints from Jennifer Chavez about Defendant Gregor's bizarre lessons and inappropriate contact with female students in and on the way to the cafeteria.

408.   She did not let on that she had personally caught Defendant Gregor behind a locked door with J.G.

409.   She did not describe her so-called "investigation" into his behavior with J.G. or Defendant Gregor's brief administrative leave.

410.   Nor did she mention that she had already permitted B.G.'s classmate, E.A., to transfer out of Defendant Gregor's class after he touched her inappropriately.

411.   When B.G.'s mother continued to urge Defendant Montoya to allow her daughter out of the class, Defendant Montoya told her that all the other classes were full and

she would have to leave her there.  B.G.'s mother responded that she would then pull B.G. out of school, which was "fine" with Defendant Montoya, who predicted that her mother would not find another school for B.G.

412.    B.G. was transferred to another elementary school by her mother.

413.    B.G. never told anyone what Defendant Gregor did to her.

414.    To this day, she struggles with feeling "stupid" for not stopping the abuse, and is fearful of disappointing others. She feels she cannot trust her own decisions and is afraid that others would see her differently if they knew of what happened to her.

## XI.    DEFENDANT GREGOR'S SEXUAL ABUSE OF PLAINTIFF JANE DOE OVER THE 2008-2009 SCHOOL YEAR, AND DEFENDANT MONTOYA'S INVOLVEMENT IN HIS MISCONDUCT

415.    Plaintiff Jane Doe was also in Defendant Gregor's fourth-grade class during the 2008-2009 school year.

416.    She had heard nothing of Defendant Gregor before the school year began, other than the fact that he was supposed to be a doctor.

417.    Jane Doe recalls that multiple people were originally assigned to the class but got out of it.  At the time, she assumed that the transfers occurred because female students didn't want a male teacher.

418.    Plaintiff Jane Doe soon saw how Defendant Gregor gave special treatment to some of his female students, but she figured that was just the way it was.

419.    Defendant Gregor wouldn't sit at a desk, but at a table, where he sat with the class "Principal," "Vice Principal," and two other officers, whose titles Plaintiff Jane Doe cannot recall.  Defendant Gregor had class-wide "elections" for the officers' positions, but the

announced winners were always girls, which Jane Doe found a little strange.  In retrospect, Jane Doe is not 100% sure whether the students actually picked the officers or not.

420.    Plaintiff Jane Doe spent a lot of time at the officers' table with Defendant Gregor.  She sometimes sat away from him, but estimates that at least half the time she was President or some other officer.

421.    Whatever subject he was teaching, Defendant Gregor would sit right at the table with his class officers.  He rarely stood up to write on the chalkboard.  Rather, he would stay seated and ask questions of the class, and, if a student got the answer right, he would throw a piece of candy at that student.

422.    Defendant Gregor always threw candy and fake money to his students, which Jane Doe enjoyed but thought could get weird, sometimes.

423.    The class officers would pass out papers for Defendant Gregor, and, if he had to get something from the principal's office, he would send an officer to retrieve it so that he could stay at his table

424.    Plaintiff Jane Doe recalls that she and B.G. would sometimes be President and Vice President together.

425.    Defendant Gregor's touching of Plaintiff Jane Doe began when he started placing his hand on her leg if she did something good, like got a right answer.  He would place his hand a little bit above her knee and the rub or squeeze her leg.

426.    Soon, Defendant Gregor started moving up her leg and gradually moved all the way to the top of her thigh.

427.    Then the touching got worse.  Defendant Gregor started to go all the way with his finger.  When Jane Doe wore a skirt, which she had liked to do, he moved his finger under

her underwear and rubbed his finger on and inside her "private part" – her vulva and vagina.

428.   This happened many times, but Jane Doe is not 100% sure how often it happened.

429.   Jane Doe also recalls how Defendant Gregor would get very close to her and whisper in her ear in a way that she found uncomfortable and disgusting.

430.   Plaintiff Jane Doe and her friends used to like to dress alike.  But when her friends asked her to wear skirts with them, she no longer wanted to, because she dreaded the touching.

431.   She told her mother that she didn't want to wear skirts anymore, because kids were making fun of her.

432.   Plaintiff Jane Doe began to dress to try to avoid Defendant Gregor's touch on her skin.  She would still wear shorts, but they were down to her knees and fitted   She also began wearing a brand of pants called Dickies, which were tight on top and loose through the legs.

433.   Many times she would also tuck in her shirt, to discourage Defendant Gregor from touching her above the waist.

434.   Plaintiff Jane Doe recalls getting in trouble for talking with another student and having to stay in the classroom at recess with Defendant Gregor.  She thought it was unfair that both she and the other student were talking, yet she was the only one to receive the punishment.

435.   To this day, Plaintiff Jane Doe has never described to anyone what happened in Defendant Gregor's classroom during that recess.

436.   There was at least one other occasion when Jane Doe had to stay alone with

Defendant Gregor, this time during lunch.  Defendant Gregor directed her to go to the cafeteria and get a tray for him, to bring it back to the classroom and to come alone.

437.   To this day, Jane Doe has never described to anyone what happened in Defendant Gregor's classroom during that lunch.

438.   After these experiences, Jane Doe never wanted to go back to Defendant Gregor's class.  When recess would end, she was always at the back of the line to come back in, or she would remain on the playground until literally everyone else was back in their classrooms.

439.   Plaintiff Jane Doe never told anyone what was happening to her.  She once saw a telenovela in which the storyline involved a young girl who was sexually abused, and whose mother and grandmother refused to believe her and got angry with her.  The girl in the telenovela ended up killing herself.  The show left a powerful impression on Jane Doe, and, having seen it, she knew that she didn't want to tell anyone what Defendant Gregor was doing to her.

440.   On many occasions during the school year, Defendant Gregor invited her to come to dinner with him and his wife.  He offered to bring her home with him after school, or to have her parents bring her.

441.   Jane Doe told her mother about the offer, and she agreed to take Jane Doe to Defendant Gregor's house for dinner.

442.   Jane Doe recalls that, at the dinner table, Defendant Gregor revealed that he and his wife were getting ready to have a baby.  He offered to show her the baby's room, which was in the back of the house, and Jane Doe agreed.

443.   Jane Doe's mother stood up and followed her to the baby's room even though he only invited Jane Doe.  Jane Doe recalls that Defendant Gregor's wife then followed Jane Doe's mother, and the group proceeded to the room single-file, like they were all playing follow the leader, with Defendant Gregor as the leader.

444.   Defendant Gregor's wife was a very quiet and young Asian woman, and Plaintiff Jane Doe thought she might be a "bought wife."

445.   Plaintiff Jane Doe never returned to Defendant Gregor's house after that visit.

446.   Jane Doe never revealed Defendant Gregor's abuse to her mother or anyone else.

447.   Plaintiff Jane Doe did not report her abuse to Defendant Montoya because she saw Defendant Montoya as a "rude type" who was cold to kids, who had been mean and intimidating to Jane Doe on a prior occasion when she had to wait after school for her mom to get off work, after the other students were picked up at the end of the day.

448.   Unlike E.A. and B.G., Plaintiff Jane Doe did not transfer to a new class or school, but remained in Defendant Gregor's class for the remainder of the year -- until he was eventually reported to law enforcement by K.S.' parents.

449.   Despite Jane Doe's remaining in Defendant Gregor's class for months after Defendant Montoya assured E.A.'s mother that she would sit in on Gregor's class and monitor his behavior, Jane Doe is certain that Defendant Montoya never came into the classroom when Jane Doe was there.

450.   To this day, Jane Doe struggles with feelings of shame, depression, and worthlessness as a result of her sexual abuse by Defendant Gregor, and has a history of cutting herself to try to numb these feelings.  She continues to actively battle to suppress memories of

situations in which she was alone with Defendant Gregor in his classroom, in order to protect herself and to be able to function in her daily life.  Jane Doe has a long history of difficulty trusting and being around older males and male authority figures, including male teachers and counselors, which has compromised her ability to function in school and the workplace, and to receive therapy.  She only ever wanted to be around people, especially males, in her own age group, and even then, she has a hard time talking to people.  She has filed the instant lawsuit because she believes that children are supposed to want to go to school and feels that people like Defendant Gregor make it hard to want to do anything, even to go on living.

## XII.   ADDITIONAL COMPLAINTS REGARDING DEFENDANT GREGOR IN 2008-2009

451.   During the same school year that Plaintiff Jane Doe was being sexually abused by Defendant Gregor, Defendant Montoya continued to parry still *more* complaints about his inappropriate behavior with female students.

452.   Although A.L. was no longer in Defendant Gregor's class, having moved up to the fifth grade, he nevertheless found an opportunity to touch her inappropriately again, groping her breast while supposedly acting to break up a fight involving her and another girl on school grounds.

453.   Defendant Montoya acknowledges that A.L.'s mother complained to her directly about this issue, which she claims that she investigated sufficiently.  Defendant Montoya claims that she asked Defendant Gregor about the incident and accepting his word when "[h]e said he didn't know that he touched her breasts or anything," which resolved the matter.  Defendant Montoya did not interview A.L. herself.

## XIII. THE REPORTING OF DEFENDANT GREGOR'S ABUSE TO LAW ENFORCEMENT, AND THE POST-REPORTING BEHAVIOR OF DEFENDANTS MONTOYA, SUPERINTENDENT COCKERHAM, AND EPS

454.    On April 14, 2009, while Plaintiff Jane Doe was still Defendant Gregor's student and a victim of his ongoing sexual abuse, Defendant Gregor was finally reported to law enforcement.   The report came more than five years after museum docents reported Gregor's inappropriate conduct to his Principal in SFPS, Vickie Sewing.

455.    The report was not made by any of the EPS officials who were familiar with the allegations against Defendant Gregor.  Rather, it was made by the father of one of Defendant Gregor's victims, K.S.

456.    The report was the result of K.S.' disclosure to her parents.  In the Spring of 2009, K.S. learned that one of her friends had a younger sister who was likely to be a student in Defendant Gregor's class in the upcoming school year. K.S. was afraid that Defendant Gregor would do the same things to that girl that he had done to her.

457.    K.S. subsequently told her mother and father what had happened to her when she was in Defendant Gregor's class during the 2007-2008 school year.

458.    K.S.'s father filed a report with law enforcement on April 14, 2009, the day after K.S. informed him of what had happened to her. He went to the police instead of the school because he did not want politics to get in the way of the investigation.

459.    Detective Bryan L. Martinez of the Espanola Police Department arranged for a Safehouse interview of K.S. on May 12, 2009, after which he reported the allegations against Defendant Gregor to Defendant EPS, through Assistant Superintendent Valdez and Superintendent Cockerham.

460.    Defendant Gregor was not placed on administrative leave by Defendant EPS until May 15, 2009. Defendant EPS took no investigative action at that time, and made no report to the PED.

461.    According to Superintendent Cockerham, it would have been inappropriate for EPS to conduct an investigation into the allegations against Defendant Gregor, because the police "were the ones that had the expertise."

462.    EPS afforded its employees complete latitude with respect to the duty imposed on them to report a "reasonable suspicion" of a student's suspected sexual abuse by an EPS employee. Indeed, according to Superintendent Cockerham, EPS employees had no duty to report suspected child abuse to the PED.

463.    Superintendent Cockerham has testified that employees were trained that a "reasonable suspicion" was a "very subjective" feeling, so that an employee was only obligated to report a fellow employee's inappropriate sexual contact with children if the observed or suspected behavior "hit the threshold – of child endangerment or child abuse" in the reporting employee's own "personal opinion."  Ergo, according to Cockerham, Defendant Montoya was not obligated to report Defendant Gregor to CYFD, despite the multitude of specific complaints against him, because the allegations did not meet her personal threshold of "child abuse."

464.    Superintendent Cockerham never asked Defendant Montoya whether Lorraine Hyde's allegations that Gregor was behaving inappropriately with J.G. "met her threshold" for reporting to CYFD, because "it was her responsibility to make that decision."

465.    Notwithstanding Superintendent Cockerham's directive, Defendant Montoya has acknowledged that she personally knew how to recognize the signs of sexual abuse or

sexual harassment, and how to do something about it. She has described "doing something about it" as contacting law enforcement about the behavior and reporting violations of established standards of conduct to the PED.

466. She knew that inappropriate touching included pinching, laying on hands, hugging, tickling, kissing, sitting on [a] lap, and hand-holding; that 90% of predators are known to the child or children; that predators are often married and are often popular with the children and with parents; that predators engage in occupations or specialties where they might have frequent one-on-one contact with children; and that predators exhibit unusual behaviors, such as giving unusual gifts.

467. Defendant Montoya has also admitted that the behavior of Defendant Gregor as reported by Ms. Hyde would be, in and of itself, "a violation of the sexual harassment policy," would "possibly [constitute the] sexual abuse of a child," and was concerning and a red flag.

468. Indeed, Defendant Montoya has also testified that the concerns expressed by Ms. Hyde caused her to think Defendant Gregor might be engaged in grooming behavior towards sexual abuse – two years before Defendant Gregor sexually abused Plaintiff Jane Doe.

469. Nevertheless, Defendant Montoya never called anyone in law enforcement about any of Defendant Gregor's behavior.

470. Moreover, on other occasions, Defendant Montoya has testified differently. In 2018, testified in a related case that she "didn't have any concerns, to my ability [sic], I didn't have any," about Defendant Gregor. She has also stated that she does not believe the allegations of Defendant Gregor's victims, though she does not know why she does not believe them.

471.    Defendant Gregor remained on paid administrative leave for an entire school year.  Throughout this period, he continued to produce lesson plans and grade students' work, on the directive of Superintendent Cockerham.

472.    Defendant Gregor's wife, Judith, was apparently allowed to serve as a substitute teacher in his classroom during this period.

473.    On January 12, 2010, Defendant Montoya signed the "Superintendent's Recommendation Form for Continuing Licensure" on behalf of Defendant Gregor.

474.    Superintendent (at the time) of Defendant EPS, Janette Archuleta, signed the same form on March 10, 2010, verifying Defendant Gregor's qualifications and recommending him for the renewal of his teaching license.

475.    Defendant Gregor filed an application for a renewal of his teaching license on May 27, 2010, with PED.

476.    In this application, he admitted that he had, in the past:

a. An adverse action taken against any certificate of license he possessed in New Mexico or any other state;

b. Been disciplined, reprimanded, suspended or discharged, from any employment because of allegations of misconduct;

c. Resigned, entered into a settlement agreement, or otherwise left employment following an allegation of misconduct; and

d. Been fingerprinted as a result of any arrest or detainment for any crime or violation of the law.

477.    Defendant Gregor attached an explanation to his application, stating that he was

arrested in 1994 for 'inappropriate conduct' toward two girls and denying that any inappropriate conduct occurred, claiming the case was dismissed due to 'lack of evidence,' and that the girls' testimony before the Utah licensing agency 'showed deception.'

478.    Months after agreeing to recommend to the PED that it renew Defendant Gregor's license, Defendant EPS finally began its own investigation, in May of 2010, into the allegations of sexual abuse against Defendant Gregor for which Defendant EPS had placed him on administrative leave approximately one year prior.

479.    During that investigation, Defendant Montoya recalled:

a. receiving a complaint from a parent about the manner in which Defendant Gregor restrained one of his female students on the playground during the 2007-2008 school year;

b. hearing concerns that Defendant Gregor was having students sleep over at his house during the 2007-2008 school year; and

c. discussing with Defendant Gregor a complaint she had received concerning his inappropriate discussions with students in his classroom during the 2007-2008 school year about older men having young and multiple wives.

480.    During that investigation, Defendant Gregor stated that Defendant Montoya had "always been very supportive of him."

481.    With respect to his practice of having students sit at his desk next to him, he informed the investigator that "Ms. Montoya fully supports me."

482.    Defendant Montoya testified that she did not know why Defendant Gregor was placed on administrative leave in May of 2009.

483.    After initially mistakenly renewing his license, despite his suspension and the

ongoing investigation into his conduct, Rather than renewing Defendant Gregor's license, PED filed a Notice of Contemplated Action against Defendant Gregor in August of 2010, seeking to refuse to renew Defendant Gregor's license.

484.    PED ultimately prevailed, and Defendant Gregor's license to teach in New Mexico has never been renewed.

## XIV.  CIVIL SUITS, CRIMINAL CONVICTIONS, AND PENDING CRIMINAL CHARGES AGAINST DEFENDANT GREGOR

485.    Defendant Gregor's sexual abuse of his young female students in the SFPS and EPS school districts has been the subject of five other federal lawsuits, involving nine other plaintiffs.

486.    These cases include *K.S., by and through her parents and next friends, T.S. and A.R. v. Espanola Public Schools, et al.* (No. 1:14-cv-00384-SCY-LF) (D.N.M. 2014); *Hernandez v. Espanola Public Schools, et al.* (No. 1:16-cv-01117-JB-SCY) (D.N.M. 2016); *Jane Does 1-4 v. Espanola Public Schools* (No. 1:17-cv-00917-KK-LF) (D.N.M. 2017); *R.P. and C.F. v. Santa Fe Public Schools, et al* (No. 1:18-cv-01051-KWR-KK) (D.N.M. 2018); and *C.M. v. Gregor, et al.* (No. 1:20-CV-00186-GJF-SCY) (D.N.M. 2020).

487.    In 2017 and 2018, the New Mexico Attorney General's Office filed felony criminal charges against Defendant Gregor in multiple cases involving young women he taught as schoolchildren in SFPS and EPS between 2003 and 2009.  Two of those cases -- involving two of his students at Fairview Elementary School during the 2007-2008 school year, Nallely Hernandez and A.L. -- were consolidated into a single case for trial.  *See State of New Mexico v. Gary F. Gregor*, No. D-117-CR-2017-00128.

488.    Following that trial, Defendant Gregor was convicted on all counts and sentenced to be imprisoned for a term of 126 years, with 18 years suspended, for an actual sentence of 108 years in the New Mexico Department of Corrections.

489.    Another of those cases, involving J.G. from Fairview Elementary, recently went to trial (after an initial mistrial) and Defendant Gregor was convicted of all counts in that case as well. *See State of New Mexico v. Gary F. Gregor,* No. D-117-CR-2017-00336.  He has been sentenced to an additional six years – the maximum sentence available under that conviction -- in that matter.

490.    The remaining two criminal cases, involving R.P. and C.F. from SFPS, have also been consolidated, and that case is currently set to proceed to trial in the Summer of 2020. *See State of New Mexico v. Gary F. Gregor*, No. D-101-CR-2018-00033.

## COUNT I

### (Plaintiff's Claims Against Defendant Gregor Under 42 U.S.C. § 1983)

491.    Plaintiff incorporates all of the preceding paragraphs as if fully stated herein.

492.    Plaintiff Jane Doe has a right to bodily integrity under the Fourteenth Amendment to the U.S. Constitution.

493.    Defendant Gregor deprived Plaintiff Jane Doe of her substantive due process right to bodily integrity under the Fourteenth Amendment to the U.S. Constitution.

494.    Defendant Gregor deprived Jane Doe of her Fourteenth Amendment right to substantive due process by physically, sexually, mentally, and emotionally abusing her, repeatedly.

495.    As a state actor, Defendant Gregor carried out, in an impermissible manner, the functions assigned to him by Defendant EPS.

496.    Defendant Gregor engaged in actions and omissions which were egregious, outrageous, or fraught with unreasonable risk.  Such actions harmed Plaintiff Jane Doe, a member of a particular, limited, closed group -- namely, the group of female students at Fairview Elementary School.

497.    Defendant Gregor was not involved in a situation demanding split-second judgments.  Instead, Defendant Gregor had time for thoughtful deliberation.

498.    Defendant Gregor's conduct shocks the conscience.

499.    Defendant Gregor's conduct was a direct and proximate cause of each of Plaintiff Jane Doe's injuries and resultant damages.

500.    Defendant Gregor's conduct was intentional, reckless, willful, and done with callous disregard for Plaintiff Jane Doe's constitutional rights.  As Defendant Gregor's conduct was motivated by malice or evil intent, Plaintiff Jane Doe is entitled to recover awards of punitive and exemplary damages against Defendant Gregor in an amount to be determined at trial.

501.    The constitutional rights of Plaintiff Jane Doe violated by Defendant Gregor were clearly established prior to Defendant Gregor's arrival in the State of New Mexico, and any reasonable school administrator, teacher, or staff member would have been aware that the conduct described herein would violate Plaintiff's constitutional rights.

## COUNT II

**(Plaintiff's Claims Against Defendant EPS Under 42 U.S.C. §1983)**

502.    Plaintiff incorporates all of the preceding paragraphs as if fully stated herein.

503.    Defendant EPS had a duty to exercise due care in the supervision of its staff, teachers, and contractors.  In addition, Defendant EPS had a duty to properly screen, license, hire, train, monitor, supervise, and discipline staff, teachers, and contractors employed or licensed by Defendant.

504.    Defendant EPS failed to adequately screen Defendant Gregor prior to his licensing and employment, and failed to take necessary actions with respect to his licensure and employment during his tenure as a teacher, licensed and employed by Defendant EPS. Defendant EPS also failed to adequately train and supervise Defendant Gregor during his tenure as a teacher licensed and employed by Defendant EPS.

505.    These failures caused Plaintiff Jane Doe to be subjected to the physical, sexual, mental, and emotional abuse described above.  Defendant EPS, because it knew or should have known of the predatory actions of Defendant Gregor prior to and during his employment with EPS, was deliberately indifferent to Plaintiff Jane Doe's constitutional rights, as exemplified by its utter failure to protect Jane Doe, causing her to suffer injuries and resultant damages.

506.    The actions and deliberate omissions of Defendant EPS were the result of a custom or policy which permitted or condoned (reflecting deliberate indifference to Plaintiff Jane Doe's, and to other female elementary school students' safety) Defendant Gregor's physical, sexual, mental, and emotional abuse of Plaintiff Jane Doe.

507.    As a consequence of Defendant EPS's defective licensing and hiring, defective supervision, and custom or policy, Plaintiff Jane Doe has been deprived under color of law of the rights, privileges, and immunities secured by the Constitution and the laws of the United States, including the right under the Fourteenth Amendment to be free from intrusions into their bodily integrity.

508.    As a direct and proximate consequence of the deprivation of their rights, Plaintiff Jane Doe has suffered the resultant injuries and damages described herein.

## COUNT III

### (Plaintiff's Claims Against Defendant Montoya Under 42 U.S.C. § 1983)

509.    Plaintiff incorporates all of the preceding paragraphs as if fully stated herein.

510.    Plaintiff Jane Doe has a right to bodily integrity under the Fourteenth Amendment to the U.S. Constitution.

511.    Defendant Montoya deprived Plaintiff Jane Doe of her substantive due process right to bodily integrity under the Fourteenth Amendment to the U.S. Constitution.

512.    Defendant Montoya deprived Jane Doe of her Fourteenth Amendment right to substantive due process by purposefully protecting Defendant Gregor; by not taking action to stop his sexual abuse of female students after having actual knowledge of inappropriate behavior, both reported to her and actually observed by her; by condoning and ratifying Defendant Gregor's sexual abuse of his female students by reprimanding them (and their classmates) not to make up stories about Defendant Gregor after they reported the abuse; and by failing to report Defendant Gregor's inappropriate conduct and sexual abuse of female

students to law enforcement or to CYFD, thereby enabling Defendant Gregor to continue to sexually, physically, mentally and emotionally abuse female students, repeatedly, including the Plaintiff, at Fairview Elementary School.

513.    As a state actor, Defendant Montoya carried out, in an impermissible manner, the functions assigned to her by Defendant EPS.

514.    Defendant Montoya engaged in actions and omissions which were egregious, outrageous, or fraught with unreasonable risk.  Such actions harmed Plaintiff Jane Doe, a member of a particular, limited, closed group -- namely, the group of female students at Fairview Elementary School.

515.    Defendant Montoya was not involved in a situation demanding split-second judgments.  Instead, Defendant Montoya had time for thoughtful deliberation.

516.    Defendant Montoya's conduct shocks the conscience.

517.    Defendant Montoya's conduct was a direct and proximate cause of each of Plaintiff's injuries and resultant damages.

518.    Defendant Montoya's conduct was intentional, reckless, willful, and done with callous disregard for Plaintiff Jane Doe's constitutional rights.  As such, Plaintiff Jane Doe is entitled to recover awards of punitive and exemplary damages against Defendant Montoya in an amount to be determined at trial.

519.    The constitutional rights of Plaintiff Jane Doe violated by Defendant Montoya were clearly established prior to Defendant Gregor's arrival in the State of New Mexico, and any reasonable school administrator, teacher, or staff member would have been aware that the conduct described herein would violate Plaintiff Jane Doe's constitutional rights.

## COUNT IV

### (Plaintiff's Claim Against Defendant EPS Under Title IX,
### 20 U.S.C. §§ 1681-1688, for Sexual Abuse)

520.    Plaintiff incorporates all of the preceding paragraphs as if fully stated herein.

521.    At all times material hereto, Plaintiff Jane Doe was a student at Fairview Elementary School, owned, controlled, operated, and administered by Defendant EPS.

522.    The sexual abuse perpetrated by Defendant Gregor against Plaintiff Jane Doe was so severe, pervasive, and objectively offensive that it deprived her of access to the educational opportunities or benefits provided by the school.

523.    Defendant EPS had actual or constructive knowledge that Defendant Gregor was sexually harassing and abusing female students, including C.M., J.G., A.L., Nallely Hernandez, K.S., E.A., and B.G.  Consequently, Defendant EPS had constructive knowledge that Defendant Gregor was also sexually abusing Plaintiff Jane Doe, a classmate to E.A. and B.G., also notoriously selected by him to be a "class officer" and kept beside him at his table.

524.    Defendant EPS was deliberately indifferent to the inappropriate relationship and illegal conduct that Defendant Gregor imposed upon these students.

525.    Defendant EPS had the authority and power to remedy the hostile environment facing Plaintiff Jane Doe, during the entire time frame in which she was subjected to Defendant Gregor's sexual abuse, but failed to do so.

526.    Defendant EPS did not provide adequate instruction or education to Fairview Elementary School students, faculty, or staff about sexual abuse, and did not enforce any

policies to prohibit or discourage the sexually abusive hostile environment facing Plaintiff Jane Doe at the hands of Defendant Gregor.

527.    Defendant EPS acted with deliberate indifference and recklessness with respect to the sexually abusive hostile environment facing Plaintiff Jane Doe.

528.    Upon information and belief, at all times material hereto, Defendant EPS received federal funding and financial assistance.

529.    Defendant EPS had a duty under Title IX, 20 U.S.C. § 1681, to provide an educational environment in which no student, including Plaintiff Jane Doe, should be excluded from education, denied the benefits of education, or discriminated against on the basis of sex.

530.    At all times material hereto, Defendant EPS, acting through and as officials, administrators, and employees, maintained customs and policies which permitted or condoned sexual abuse of students by staff and teachers during school hours and school activities.

531.    As a result of these customs and policies, Plaintiff Jane Doe was subjected to invasive, severe, and objectively offensive sexual, physical, emotional, and mental abuse by Defendant Gregor during school hours and official school activities.  The sexual assaults and batteries upon her were the natural and inevitable consequence of effectively unsupervised classroom and on-campus activities.

532.    Defendant EPS failed to properly and adequately instruct administrators, supervisors, employees, and contractors as to how to respond to inappropriate behavior, including sexual abuse, by EPS employees toward students enrolled in Fairview Elementary School.  Defendant EPS did not develop or promulgate adequate policies addressing issues of

sexual abuse by a teacher or staff member against a student or students.  The deliberate indifference of Defendant EPS, and its officials, administrators, and employees, to the acts of sexual abuse, as well as its failure to adopt, publish, and inculcate appropriate policies concerning such abuse and harassment, deprived Plaintiff Jane Doe of benefits under Title IX, and subjected her to discrimination on the basis of her sex, female, in violation of Title IX.  It further caused Jane Doe to be excluded from participation in, denied the benefits of, and be subjected to discrimination on the basis of sex under an education program or activity receiving federal financial assistance.

533.    As a direct and proximate consequence of the discrimination and violation of Title IX, Plaintiff Jane Doe has suffered the resultant injuries and damages described herein.

## COUNT V

**(Plaintiff's Claim Against Defendant EPS and Defendant Montoya Under the New Mexico Tort Claims Act, NMSA 1978, § 41-4-6)**

534.    Plaintiff incorporates all of the preceding paragraphs as if fully stated herein.

535.    At all times material hereto, Defendant EPS operated Fairview Elementary School, which Plaintiff Jane Doe attended, as well as other public schools in Espanola, while Defendant Montoya served as Principal of Fairview Elementary.

536.    Defendant EPS and Defendant Montoya -- who was acting within the scope of her employment with Defendant EPS -- had the duty in any activity actually undertaken to exercise for the safety of others, including Plaintiff Jane Doe, that care ordinarily exercised by a reasonable, prudent, and qualified person in their position in light of the nature of what was being done.

537.    Defendant EPS had a duty to Plaintiff Jane Doe and similarly-situated students to exercise reasonable care in the maintenance and operation of Fairview Elementary School and the other Espanola public schools, and to keep all of their educational campuses and premises in a safe condition.

538.    Defendant Montoya likewise had a duty to Plaintiff Jane Doe and similarly-situated students to exercise reasonable care in the maintenance and operation of Fairview Elementary School.

539.    Defendants EPS and Montoya had a further duty to supervise their employees, contractors, and agents to ensure that they did not act negligently in the operation or maintenance of their buildings.

540.    Supervision includes the obligation to adopt and inculcate reasonable and proper operational policies and procedures concerning the safe operation of Defendant EPS' educational facilities, including appropriate policies and procedures concerning employee training, adequate monitoring and regulation of their employee's activities, and other such policies and procedures as are reasonably necessary to ensure adequate safety in the operation and maintenance of Defendant EPS' educational facilities, such as Fairview Elementary School, in order to avoid unsafe, dangerous, or defective conditions on the premises.

541.    Defendants EPS and Montoya, in maintaining and operating the premises of Fairview Elementary in a safe condition, had a duty to supervise teachers and other employees and to protect minor students, including Plaintiff Jane Doe, from sexual assaults, batteries, abuse, or harassment from other persons, including Defendant Gregor.

542.    Defendant EPS – acting through its administrators, supervisors, employees, and contractors − and Defendant Montoya had the duty to adopt and implement proper safety

policies and procedures to protect its minor students, including Plaintiff Jane Doe, from sexual assaults, batteries, abuse, or harassment from other persons, including Defendant Gregor.

543.    Defendant EPS – acting through its administrators, supervisors, employees, and contractors – and Defendant Montoya had a duty to investigate and act upon any suspicions or reports of improper sexual assaults, batteries, abuse, or harassment by EPS employees or agents against any student attending Defendant EPS' schools.

544.    Defendants EPS and Montoya failed to exercise reasonable care in the maintenance of the premises in a safe condition, because they repeatedly ignored the warning signs and the readily observable (and reported) inappropriate behavior of Defendant Gregor toward female students.

545.    Defendants EPS and Montoya failed to use ordinary care to protect Plaintiff Jane Doe from the danger posed to her by Defendant Gregor.

546.    Defendants EPS and Montoya breached their duties of care towards Plaintiff Jane Doe.

547.    Defendant EPS further breached its duties of care by failing to properly screen, hire, train, monitor, supervise and discipline employees of Fairview Elementary School, such as Defendant Gregor, as well as by failing to enact or enforce appropriate policies, procedures and protocols concerning safety in student-teacher interactions, and by otherwise failing to take appropriate and reasonable supervisory actions to correct the potential problems and prevent the harm and injuries incurred by Plaintiff Jane Doe.

548.    Defendant EPS is jointly and severally liable for all injuries and damages caused Jane Doe by the actions of its administrators and employees, including Defendant Montoya and Defendant Gregor, pursuant to the doctrines of vicarious liability and respondeat superior.

549.   The above-described conduct of Defendants EPS and Montoya was a direct and proximate cause of the injuries to Plaintiff Jane Doe, and the resultant damages described herein.

## PRAYER FOR RELIEF

550.   Plaintiff incorporates all of the preceding paragraphs as if fully stated herein.

551.   As a direct and proximate result of the wrongful and unlawful acts and omissions of all Defendants, as described above, Plaintiff Jane Doe was injured and has suffered and continues to suffer damages, including, but not limited to: physical injury, severe emotional distress, anguish, suffering, humiliation, psychological injuries, indignities, loss of enjoyment of life, deprivation of constitutional rights, invasion of bodily integrity, and other incidental, consequential, and special damages.

552.   As a result of the above-described damages and injuries, Plaintiff Jane Doe is entitled to recover an award of full compensatory damages against all Defendants in amounts to be determined at the trial of this cause.

553.   Plaintiff Jane Doe requests damages in an amount sufficient to compensate her for all injuries and harm she suffered, as well as punitive damages as provided by law, along with costs of this action, pre- and post- judgment interest as provided by law, reasonable attorneys' fees as provided by law, and such other and further relief as proves just.

554.   Plaintiff Jane Doe requests a trial by jury on all issues so triable.

Respectfully submitted,

ROTHSTEIN DONATELLI LLP

*/s/ Carolyn M. "Cammie" Nichols*
CAROLYN M. "CAMMIE" NICHOLS
ALICIA C. LOPEZ
MAGGIE H. LANE
500 4th St., NW, Suite 400
Albuquerque, New Mexico 87102
505-243-1443
cmnichols@rothsteinlaw.com
alopez@rothsteinlaw.com
mhlane@rothsteinlaw.com

*and*

LINDA G. HEMPHILL
The Hemphill Firm, P.C.
P. O. Box 33136
Santa Fe, NM 87594
505-986-8515
linda@hemphillfirm.com

*and*

LINDA MARTINEZ-PALMER
Martinez-Palmer Law Firm, LLC
2011 Botulph Road, Suite 200
Santa Fe, NM 87505
505-986-2830
lmartinezpalmerlaw@gmail.com


***Attorneys for Plaintiff Jane Doe***